[No. S125912. Aug. 22, 2005.]

ELISA B., Petitioner, v.
THE SUPERIOR COURT OF EL DORADO COUNTY, Respondent;
EMILY B. et al., Real Parties in Interest.

**COUNSEL**

Hanke & Williams and Shelly L. Hanke for Petitioner.

Liberty Counsel, Mathew D. Staver, Rena M. Lindevaldsen and Mary E. McAlister for Kristina Sica as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, James M. Humes, Chief Assistant Attorney General, Thomas R. Yanger, Assistant Attorney General, Margarita Altamirano and Kara Read-Spangler, Deputy Attorneys General, for the public interest pursuant to Family Code sections 17406–17407.

Louis B. Green, County Counsel, Edward L. Knapp, Chief Assistant County Counsel; Mary A. Roth; and Mary Jane Hamilton for Real Party in Interest County of El Dorado.

National Center for Lesbian Rights, Shannon Minter and Courtney Joslin for Real Party in Interest Emily B.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Real Party in Interest Emily B.

Valerie Ackerman and Shannan Wilber for National Center for Youth Law and Legal Services for Children as Amici Curiae on behalf of Real Party in Interest Emily B.

Alice Bussiere for The Center for Children's Rights at Whittier Law School, The Legal Aid Foundation of Los Angeles, The National Center for Youth Law, The Youth Law Center and Joan Heifetz Hollinger and the Children's Advocacy Project, Boalt Hall as Amici Curiae on behalf of Real Party in Interest Emily B.

Jennifer C. Pizer and Amber Garza for Children of Lesbians and Gays Everywhere, Equality California, Family Matters, Family Pride Coalition, Growing Generations, Lambda Legal Defense and Education Fund, the National Center for Lesbian Rights, Our Family Coalition, the Pop Luck Club and Southern California Assisted Reproduction Attorneys as Amici Curiae on behalf of Real Party in Interest Emily B.

Debra Back Marley and Robert C. Fellmeth for Children's Advocacy Institute as Amicus Curiae on behalf of Real Party in Interest Emily B.

ACLU Foundation of Southern California, Clare Pastore, Christine Sun; ACLU Foundation of Northern California, Alan Schlosser; ACLU Foundation of San Diego and Imperial Counties, Jordan Budd, Elvira Cacciavillani; ACLU Foundation Lesbian and Gay Rights Project and James Esseks for the American Civil Liberties Union of Southern California, the American Civil Liberties Union of Northern California, the American Civil Liberties Union of San Diego and Imperial Counties and the American Civil Liberties Union as Amici Curiae on behalf of Real Party in Interest Emily B.

Maxie Rheinheimer Stephens & Vrevich, Darin L. Wessel; Laura J. Maechtlen; and Vanessa H. Eisemann for Tom Homann Law Association, Bay Area Lawyers for Individual Freedom, Lesbian and Gay Lawyers Association of Los Angeles, and Sacramento Lawyers for the Equality of Gays and Lesbians as Amici Curiae on behalf of Real Parties in Interest Emily B. and El Dorado County.

Donna Wickham Furth; Wilke, Fleury, Hoffelt, Gould & Birney and William A. Gould, Jr., for Northern California Association of Counsel for Children, National Association of Counsel for Children and The California Psychological Association as Amici Curiae on behalf of Minors.

Geragos & Geragos, Gregory R. Ellis; and Rebekah A. Frye for The Los Angeles County Bar Association, The San Fernando Valley Bar Association and its Family Law Center, The Family Law Section of the Beverly Hills Bar

Association, The Bar Association of San Francisco, The Association of Certified Law Specialists and Women Lawyers Association of Los Angeles as Amici Curiae on behalf of Minors.

Morrison & Foerster, Ruth N. Borenstein and Johnathan E. Mansfield for California NOW, Inc., and California Women's Law Center as Amici Curiae.

## OPINION

**MORENO, J.**—We granted review in this case, as well as in *K.M. v. E.G.* (2005) 37 Cal.4th 130 [33 Cal.Rptr.3d 61, 117 P.3d 673], and *Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156 [33 Cal.Rptr.3d 81, 117 P.3d 690], to consider the parental rights and obligations, if any, of a woman with regard to a child born to her partner in a lesbian relationship.

In the present action for child support filed by the El Dorado County District Attorney, we conclude that a woman who agreed to raise children with her lesbian partner, supported her partner's artificial insemination using an anonymous donor, and received the resulting twin children into her home and held them out as her own, is the children's parent under the Uniform Parentage Act and has an obligation to support them.

### FACTS

On June 7, 2001, the El Dorado County District Attorney filed a complaint in superior court to establish that Elisa B. is a parent of two-year-old twins Kaia B. and Ry B., who were born to Emily B.,[1] and to order Elisa to pay child support.[2] Elisa filed an answer in which she denied being the children's parent.

A hearing was held at which Elisa testified that she entered into a lesbian relationship with Emily in 1993. They began living together six months later. Elisa obtained a tattoo that read "Emily, por vida," which in Spanish means Emily, for life. They introduced each other to friends as their "partner," exchanged rings, opened a joint bank account, and believed they were in a committed relationship.

---

[1] In order to protect the confidentiality of the minors, we will refer to the parties by their first names.

[2] Family Code section 17400, subdivision (a), provides, in pertinent part: "Each county shall maintain a local child support agency . . . that shall have the responsibility for promptly and effectively establishing, modifying, and enforcing child support obligations . . . and determining paternity in the case of a child born out of wedlock. The local child support agency shall take appropriate action, including criminal action in cooperation with the district attorneys, to establish, modify, and enforce child support . . . ."

Elisa and Emily discussed having children and decided that they both wished to give birth. Because Elisa earned more than twice as much money as Emily, they decided that Emily "would be the stay-at-home mother" and Elisa "would be the primary breadwinner for the family." At a sperm bank, they chose a donor they both would use so the children would "be biological brothers and sisters."

After several unsuccessful attempts, Elisa became pregnant in February 1997. Emily was present when Elisa was inseminated. Emily began the insemination process in June of 1997 and became pregnant in August 1997. Elisa was present when Emily was inseminated and, the next day, Elisa picked up additional sperm at the sperm bank and again inseminated Emily at their home to "make sure she got pregnant." They went to each other's medical appointments during pregnancy and attended childbirth classes together so that each could act as a "coach" for the other during birth, including cutting the children's umbilical cords.

Elisa gave birth to Chance in November 1997, and Emily gave birth to Ry and Kaia prematurely in March 1998. Ry had medical problems; he suffered from Down's syndrome, and required heart surgery.

They jointly selected the children's names, joining their surnames with a hyphen to form the children's surname. They each breast-fed all of the children. Elisa claimed all three children as her dependents on her tax returns and obtained a life insurance policy on herself naming Emily as the beneficiary so that if "anything happened" to her, all three children would be "cared for." Elisa believed the children would be considered both of their children.

Elisa's parents referred to the twins as their grandchildren, and her sister referred to the twins as part of their family and referred to Elisa as the twins' mother. Elisa treated all of the children as hers and told a prospective employer that she had triplets. Elisa and Emily identified themselves as coparents of Ry at an organization arranging care for his Down's syndrome.

Elisa supported the household financially. Emily was not working. Emily testified that she would not have become pregnant if Elisa had not promised to support her financially, but Elisa denied that any financial arrangements were discussed before the birth of the children. Elisa later acknowledged in her testimony, however, that Emily "was going to be an at-home mom for maybe a couple of years and then the kids were going to go into day care and she was going to return to work."

They consulted an attorney regarding adopting "each other's child," but never did so. Nor did they register as domestic partners or execute a written

agreement concerning the children. Elisa stated she later reconsidered adoption because she had misgivings about Emily adopting Chance.

Elisa and Emily separated in November 1999. Elisa promised to support Emily and the twins "as much as I possibly could" and initially paid the mortgage payments of approximately $1,500 per month on the house in which Emily and the twins continued to live, as well as other expenses. Emily applied for aid. When they sold the house and Emily and the twins moved into an apartment in November 2000, Elisa paid Emily $1,000 a month. In early 2001, Elisa stated she lost her position as a full-time employee and told Emily she no longer could support her and the twins. At the time of trial, Elisa was earning $95,000 a year.

The superior court rendered a written decision on July 11, 2002, finding that Elisa and Emily had rejected the option of using a private sperm donor because "[t]hey wanted the child to be raised <u>exclusively</u> by them as a couple." The court further found that they intended to create a child and "acted in all respects as a family," adding "that a person who uses reproductive technology is accountable as a de facto legal parent for the support of that child. Legal parentage is not determined exclusively by biology."

The court further found that Elisa was obligated to support the twins under the doctrine of equitable estoppel, finding Emily "agreed to have children with Respondent, and relied on her promise to raise and support her children. She would not have agreed to impregnation but for this agreement and understanding." "The need for the application of this doctrine is underscored by the fact that the decision of Respondent to create a family and desert them has caused the remaining family members to seek county assistance. One child that was created has special needs that will require the remaining parent or the County to be financially responsible for those needs. The child was deprived of the right to have a traditional father to take care of the financial needs of this child. Respondent chose to step in those shoes and assume the role and responsibility of the 'other' parent. This should be her responsibility and not the responsibility of the taxpayer." Elisa was subsequently ordered to pay child support in the amount of $907.50 per child for a total of $1815 per month.

Elisa petitioned the Court of Appeal for a writ of mandate, and the court directed the superior court to vacate its order and dismiss the action, concluding that Elisa had no obligation to pay child support because she was not a parent of the twins within the meaning of the Uniform Parentage Act (Fam. Code, § 7600 et seq.). We granted review.

DISCUSSION

 We must determine whether the Court of Appeal erred in ruling that Elisa could not be a parent of the twins born to her lesbian partner, and thus had no obligation to support them. This question is governed by the Uniform Parentage Act (UPA). (Fam. Code, § 7600 et seq.)[3] The UPA defines the " '[p]arent and child relationship' " as "the legal relationship existing between a child and the child's natural or adoptive parents . . . . The term includes the mother and child relationship and the father and child relationship." (§ 7601.) One purpose of the UPA was to eliminate distinctions based upon whether a child was born into a marriage, and thus was "legitimate," or was born to unmarried parents, and thus was "illegitimate." (*Johnson v. Calvert* (1993) 5 Cal.4th 84, 88 [19 Cal.Rptr.2d 494, 851 P.2d 776].) Thus, the UPA provides that the parentage of a child does not depend upon " 'the marital status of the parents' " (*Johnson, supra*, at p. 89), stating: "The parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents." (§ 7602.)

The UPA contains separate provisions defining who is a "mother" and who is a "father." Section 7610 provides that "[t]he parent and child relationship may be established . . . : [¶] (a) Between a child and the natural mother . . . by proof of her having given birth to the child, or under this part." Subdivision (b) of section 7610 states that the parental relationship "[b]etween a child and the natural father . . . may be established under this part."

 Section 7611 provides several circumstances in which "[a] man is presumed to be the natural father of a child," including: if he is the husband of the child's mother, is not impotent or sterile, and was cohabiting with her (§ 7540); if he signs a voluntary declaration of paternity stating he is the "biological father of the child" (§ 7574, subd. (b)(6)); and if "[h]e receives the child into his home and openly holds out the child as his natural child" (§ 7611, subd. (d)).

Although, as noted above, the UPA contains separate provisions defining who is a mother and who is a father, it expressly provides that in determining the existence of a mother and child relationship, "[i]nsofar as practicable, the provisions of this part applicable to the father and child relationship apply." (§ 7650.)

The Court of Appeal correctly recognized that, under the UPA, Emily has a parent and child relationship with each of the twins because she gave birth to them. (§ 7610, subd. (a).) Thus, the Court of Appeal concluded, Emily is the

---

[3] Further statutory references are to the Family Code, unless otherwise noted.

twins' natural mother. Relying upon our statement in *Johnson v. Calvert, supra,* 5 Cal.4th 84, 92, that "for any child California law recognizes only one natural mother," the Court of Appeal reasoned that Elisa, therefore, could not also be the natural mother of the twins and thus "has no legal maternal relationship with the children under the UPA."

The Attorney General, appearing pursuant to section 17406 to "represent the public interest in establishing, modifying, and enforcing support obligations," argues that the Court of Appeal erred, stating: "*Johnson*'s one-natural-mother comment cannot be thoughtlessly interpreted to deprive the children of same-sex couples the same opportunity as other children to two parents and to two sources of child support when only two parties are eligible for parentage." As we shall explain, the Attorney General is correct that our statement in *Johnson* that a child can have "only one natural mother" does not mean that both Elisa and Emily cannot be parents of the twins.

The issue before us in *Johnson* was whether a wife whose ovum was fertilized in vitro by her husband's sperm and implanted in a surrogate mother was the mother of the child so produced, rather than the surrogate. (*Johnson v. Calvert, supra,* 5 Cal.4th 84, 87.) The surrogate claimed that she was the child's mother because she had given birth to the child. No provision of the UPA expressly addresses the parental rights of a woman who, like the wife in *Johnson v. Calvert,* has not given birth to a child, but has a genetic relationship because she supplied the ovum used to impregnate the birth mother. But, as noted above, the UPA does provide that provisions applicable to determining a father and child relationship shall be used to determine a mother and child relationship "[i]nsofar as practicable." (Former Civ. Code, § 7015, now Fam. Code, § 7650.) Accordingly, we looked to the provisions regarding presumptions of paternity and concluded that "genetic consanguinity" could be the basis for a finding of maternity just as it is for paternity. (*Johnson v. Calvert, supra,* 5 Cal.4th 84, 92.)

We concluded, therefore, that both women—the surrogate who gave birth to the child and the wife who supplied the ovum—had "adduced evidence of a mother and child relationship as contemplated by the Act." (*Johnson v. Calvert, supra,* 5 Cal.4th 84, 92.) Anticipating this result, the American Civil Liberties Union appearing as amicus curiae urged this court to rule that the child, therefore, had two mothers. Because it was undisputed that the husband, who had supplied the semen used to impregnate the surrogate, was the child's father, this would have left the child with three parents. We declined the invitation, stating: "Even though rising divorce rates have made multiple parent arrangements common in our society, we see no compelling reason to recognize such a situation here. The Calverts are the genetic and intending parents of their son and have provided him, by all accounts, with a

stable, intact, and nurturing home. To recognize parental rights in a third party with whom the Calvert family has had little contact since shortly after the child's birth would diminish [the wife]'s role as mother." (*Id.* at p. 92, fn. 8.) We held instead that "for any child California law recognizes only one natural mother" (*id.* at p. 92), and proceeded to conclude that the wife, rather than the surrogate, was the child's mother: "We conclude that although the Act recognizes both genetic consanguinity and giving birth as means of establishing a mother and child relationship, when the two means do not coincide in one woman, she who intended to procreate the child—that is, she who intended to bring about the birth of a child that she intended to raise as her own—is the natural mother under California law." (*Id.* at p. 93, fn. omitted.)

 In *Johnson*, therefore, we addressed the situation in which three people claimed to be the child's parents: the husband, who undoubtedly was the child's father, and two women, who presented conflicting claims to being the child's mother. We rejected the suggestion of amicus curiae that both the wife and the surrogate could be the child's mother, stating that a child can have only one mother, but what we considered and rejected in *Johnson* was the argument that a child could have three parents: a father and two mothers.[4] We did not address the question presented in this case of whether a child could have two parents, both of whom are women.[5] The Court of Appeal in the present case erred, therefore, in concluding that our statement in *Johnson* that a child can have only one mother under California law resolved the issue presented in this case. "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]" (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)[6]

---

[4] We have not decided "whether there exists an overriding legislative policy limiting a child to two parents." (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 427, fn. 6 [2 Cal.Rptr.3d 699, 73 P.3d 554].)

[5] The situation is analogous to that in *Sharon S. v. Superior Court, supra,* 31 Cal.4th 417, in which we held that a mother could consent to a "second parent" adoption by her lesbian partner despite our earlier dictum in *Estate of Jobson* (1912) 164 Cal. 312, 317 [128 P. 938], that the "duties of a child cannot be owed to two fathers at one time." We explained that this statement was "uttered in the context of concluding that a birth father who 'by virtue of the adoption proceeding [in that case], ceased to sustain the legal relation of father' could not thereafter inherit the adopted person's estate [citation] . . . , we did not consider the contingency before us today—viz., two parties who voluntarily have waived the benefit of section 8617 in order to effect a second parent adoption, where the natural parent's relationship with the child is not superseded." (*Sharon S.*, at p. 430, fn. 7.)

[6] Elisa also relies upon our observation in *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 [43 Cal.Rptr.2d 445, 898 P.2d 891], that "In essence, therefore, our statutory scheme creates three classes of parents: mothers, fathers who are presumed fathers, and fathers who are not presumed fathers. [Citation.]" The issue in that case was whether an unwed father was a

■ We perceive no reason why both parents of a child cannot be women. That result now is possible under the current version of the domestic partnership statutes, which took effect this year. (§ 297 et seq.) Two women "who have chosen to share one another's lives in an intimate and committed relationship of mutual caring" and have a common residence (§ 297) can file with the Secretary of State a "Declaration of Domestic Partnership" (§ 298). Section 297.5, subdivision (d) provides, in pertinent part: "The rights and obligations of registered domestic partners with respect to a child of either of them shall be the same as those of spouses."

Prior to the effective date of the current domestic partnership statutes, we recognized in an adoption case that a child can have two parents, both of whom are women. In *Sharon S. v. Superior Court, supra,* 31 Cal.4th 417, we upheld a "second parent" adoption in which the mother of a child that had been conceived by means of artificial insemination consented to adoption of the child by the mother's lesbian partner. If both parents of an adopted child can be women, we see no reason why the twins in the present case cannot have two parents, both of whom are women.

■ Having determined that our decision in *Johnson* does not preclude a child from having two parents both of whom are women and that no reason appears that a child's two parents cannot both be women, we proceed to examine the UPA to determine whether Elisa is a parent to the twins in addition to Emily. ■ As noted above, section 7650 provides that provisions applicable to determining a father and child relationship shall be used to determine a mother and child relationship "insofar as practicable." (*Johnson v. Calvert, supra,* 5 Cal.4th 84, 90; see *In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410, 1418 [72 Cal.Rptr.2d 280] [the declaration in section 7613 that a husband who consents to artificial insemination is "treated in law" as the father of the child applies equally to the wife if a surrogate, rather than the wife, is artificially inseminated, making both the wife and the husband the parents of the child so produced].)

■ Subdivision (d) of section 7611 states that a man is presumed to be the natural father of a child if "[h]e receives the child into his home and openly holds out the child as his natural child." The Court of Appeal in *In re Karen C.* (2002) 101 Cal.App.4th 932, 938 [124 Cal.Rptr.2d 677], held that subdivision (d) of section 7611 "should apply equally to women." This conclusion was echoed by the court in *In re Salvador M.* (2003) 111 Cal.App.4th 1353, 1357 [4 Cal.Rptr.3d 705], which stated: "Though most of the decisional law has focused on the definition of the presumed father, the

---

presumed father and thus could withhold his consent to the mother's planned adoption of their child. We did not consider the questions raised in the present case.

legal principles concerning the presumed father apply equally to a woman seeking presumed mother status. [Citation.]"[7]

Applying section 7611, subdivision (d), we must determine whether Elisa received the twins into her home and openly held them out as her natural children. There is no doubt that Elisa satisfied the first part of this test; it is undisputed that Elisa received the twins into her home. Our inquiry focuses, therefore, on whether she openly held out the twins as her natural children.

■ The circumstance that Elisa has no genetic connection to the twins does not necessarily mean that she did not hold out the twins as her "natural" children under section 7611. We held in *In re Nicholas H.* (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932] that the presumption under section 7611, subdivision (d), that a man who receives a child into his home and openly holds the child out as his natural child is not necessarily rebutted when he admits he is not the child's biological father.

The presumed father in *Nicholas H.*, Thomas, met the child's mother, Kimberly, when she was pregnant with Nicholas. Nevertheless, Thomas was named as the child's father on his birth certificate and provided a home for the child and his mother for several years. Thomas did not marry Kimberly. When Nicholas was removed by the court from Kimberly's care, Thomas sought custody as the child's presumed father, although he admitted he was not Nicholas's biological father.

■ We held in *Nicholas H.* that Thomas was presumed to be Nicholas's father despite his admission that he was not Nicholas's biological father. The Court of Appeal had reached the opposite conclusion, observing that " 'the Legislature has used the term "natural" to mean "biological" ' " and concluding that the presumption under section 7611, subdivision (d) is rebutted under section 7612, subdivision (a) by clear and convincing evidence " 'that the man is not the child's natural, biological father.' " (*In re Nicholas H., supra,* 28 Cal.4th 56, 62–63.) We noted, however, that the UPA does not state that the presumption under section 7611, subdivision (d), *is* rebutted by evidence that the presumed father is not the child's biological father, but rather that it *may* be rebutted *in an appropriate action* by such evidence. (*In re Nicholas H., supra,* at p. 63.) We held that *Nicholas H.* was not an appropriate action in which to rebut the presumption because no one had raised a conflicting claim to being the child's father. Applying the presumption, therefore, would produce the "harsh result" of leaving the child fatherless. (*Id.* at p. 59.) We quoted language from the Court of Appeal opinion in *Steven W. v. Matthew S.*

---

[7] The fact that questions involving the determination of parentage "focus on paternity is likely due to the fact the identity of a child's birth mother is rarely in dispute." (*In re Karen C., supra,* 101 Cal.App.4th 932, 936.)

(1995) 33 Cal.App.4th 1108, 1116–1117 [39 Cal.Rptr.2d 535], recognizing that " ' " ' "[a] man who has lived with a child, treating it as his son or daughter, has developed a relationship with the child that should not be lightly dissolved . . . . This social relationship is much more important, to the child at least, than a biological relationship of actual paternity. . . ." ' " ' " (*In re Nicholas H.*, *supra*, 28 Cal.4th at p. 65; see *In re Jesusa V.* (2004) 32 Cal.4th 588, 604 [10 Cal.Rptr.3d 205, 85 P.3d 2] ["the statute did not contemplate a reflexive rule that biological paternity would rebut the section 7611 presumption in all cases, without concern for whether rebuttal was 'appropriate' in the particular circumstances"].)

The Court of Appeal in *In re Karen C.*, *supra*, 101 Cal.App.4th 932, 938, applied the principles discussed in *Nicholas H.* regarding presumed fathers and concluded that a woman with no biological connection to a child could be a presumed mother under section 7611, subdivision (d). Twelve-year-old Karen C. petitioned for an order determining the existence of a mother and child relationship between her and Leticia C., who had raised her from birth. Leticia admitted she was not Karen's biological mother, explaining that Karen's birth mother had tried unsuccessfully to abort her pregnancy and then agreed to give the child to Leticia. The birth mother falsely told the hospital staff that her name was Leticia C. so that Leticia's name would appear on the child's birth certificate. The birth mother gave Karen to Leticia promptly after the child was born. The juvenile court denied Karen's petition, ruling that Leticia could not be Karen's mother because she had not given birth to her and they had no genetic relationship. The Court of Appeal reversed, determining that Leticia was the child's presumed mother under section 7611 because she had taken Karen into her home and raised her as her child. (*In re Karen C.*, *supra*, 101 Cal.App.4th at p. 938.) The court remanded the matter to the juvenile court to apply the rule in *Nicholas H.* to determine whether this was " 'an appropriate action' " in which to find the presumption that Leticia was Karen's mother was rebutted by the fact that she had not given birth to her. (*Ibid.*)

Similarly, the Court of Appeal in *In re Salvador M.*, *supra*, 111 Cal.App.4th 1353, 1357–1378, held that a woman who had raised her half brother as her son could be the child's presumed mother under section 7611, subdivision (d). In that case, the child's mother died when he was three years old and he was raised by his 18-year-old half sister, who had a four-year-old daughter of her own and later gave birth again. The child believed that his half sister was his mother and that her offspring were his siblings. His half sister revealed her true relation to the child " 'in official matters such as school registration,' " but maintained that " 'to the rest of the world [the child] is my son.' " (*In re Salvador M.*, *supra*, at p. 1356.) The Court of Appeal applied section 7611, subdivision (d), stating: "The paternity presumptions are driven, not by biological paternity, but by the state's interest in

the welfare of the child and the integrity of the family. [Citation.]" (*In re Salvador M., supra,* at pp. 1357–1358.) The court concluded that the half sister had openly held out the child as her own, despite admitting to various officials that she was the child's half sister, noting that "the most compelling evidence" that she held out the child as her own was that the eight-year-old child "*believed* appellant was his mother" which supported the conclusion that she held the child "out to the community as her son." (*Id.* at p. 1358.) Having concluded that she was the child's presumed mother under section 7611, subdivision (d), the court concluded that this was "clearly *not* an appropriate case" to find the presumption was rebutted by the fact that she was not the child's birth mother, "because there was no competing maternal interest and to sever this deeply rooted mother/child bond would contravene the state's interest in maintaining the family relationship." (*In re Salvador M., supra,* at p. 1359.)

We conclude that the present case, like *Nicholas H.* and *Salvador M.,* is not "an appropriate action" in which to rebut the presumption of presumed parenthood with proof that Elisa is not the twins' biological parent. This is generally a matter within the discretion of the superior court (*In re Jesusa V., supra,* 32 Cal.4th 588, 606), but we need not remand the matter to permit the superior court to exercise its discretion because it would be an abuse of discretion to conclude that the presumption may be rebutted in the present case. It is undisputed that Elisa actively consented to, and participated in, the artificial insemination of her partner with the understanding that the resulting child or children would be raised by Emily and her as coparents, and they did act as coparents for a substantial period of time. Elisa received the twins into her home and held them out to the world as her natural children. She gave the twins and the child to whom she had given birth the same surname, which was formed by joining her surname to her partner's. The twins were half siblings to the child to whom Elisa had given birth. She breast-fed all three children, claimed all three children as her dependents on her tax returns, and told a prospective employer that she had triplets. Even at the hearing before the superior court, Elisa candidly testified that she considered herself to be the twins' mother.

Declaring that Elisa cannot be the twins' parent and, thus, has no obligation to support them because she is not biologically related to them would produce a result similar to the situation we sought to avoid in *Nicholas H.* of leaving the child fatherless. The twins in the present case have no father because they were conceived by means of artificial insemination using an anonymous semen donor. Rebutting the presumption that Elisa is the twin's parent would leave them with only one parent and would deprive them of the support of their second parent. Because Emily is financially unable to support the twins, the financial burden of supporting the twins would be borne by the county, rather than Elisa.

In establishing a system for a voluntary declaration of paternity in section 7570, the Legislature declared: "There is a compelling state interest in establishing paternity for all children. Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights. . . ."

By recognizing the value of determining paternity, the Legislature implicitly recognized the value of having two parents, rather than one, as a source of both emotional and financial support, especially when the obligation to support the child would otherwise fall to the public. (See *Librers v. Black* (2005) 129 Cal.App.4th 114, 123 [28 Cal.Rptr.3d 188] ["whenever possible, a child should have the benefit of *two* parents to support and nurture him or her"]; *In re Marriage of Pedregon* (2003) 107 Cal.App.4th 1284 [132 Cal.Rptr.2d 861] [recognizing the importance to a child of having the support of two parents]; *Clevenger v. Clevenger* (1961) 189 Cal.App.2d 658, 662 [11 Cal.Rptr. 707].)

We observed in dicta in *Nicholas H.* that it would be appropriate to rebut the section 7611 presumption of parentage if "a court decides that the legal rights and obligations of parenthood should devolve upon an unwilling candidate." (*In re Nicholas H., supra*, 28 Cal.4th 56, 70.) But we decline to apply our dicta in *Nicholas H.* here, because we did not consider in *Nicholas H.* a situation like that in the present case.

Although Elisa presently is unwilling to accept the obligations of parenthood, this was not always so. She actively assisted Emily in becoming pregnant with the expressed intention of enjoying the rights and accepting the responsibilities of parenting the resulting children. She accepted those obligations and enjoyed those rights for years. Elisa's present unwillingness to accept her parental obligations does not affect her status as the children's mother based upon her conduct during the first years of their lives.

Further, our observation in *Nicholas H.* that the obligations of parenthood should not be forced upon an unwilling candidate who is not biologically related to the child must be understood in light of the circumstances before us in *Nicholas H.* In that case, as noted above, the presumed father met the child's mother when she was pregnant and voluntarily accepted the unborn child as his own. When the child later was removed from the mother's custody, the presumed father was denied custody of the child because he was not the child's biological father.

In the present case, Elisa did not meet Emily after she was pregnant, but rather was in a committed relationship with her when they decided to have

children together. Elisa actively assisted Emily in becoming pregnant, with the understanding that they would raise the resulting children together. Having helped cause the children to be born, and having raised them as her own, Elisa should not be permitted to later abandon the twins simply because her relationship with Emily dissolved.

 As we noted in the context of a husband who consented to the artificial insemination of his wife using an anonymous sperm donor, but later denied responsibility for the resulting child: "One who consents to the production of a child cannot create a temporary relation to be assumed and disclaimed at will, but the arrangement must be of such character as to impose an obligation of supporting those for whose existence he is directly responsible." (*People v. Sorensen* (1968) 68 Cal.2d 280, 285 [66 Cal.Rptr. 7, 437 P.2d 495]; see *Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 191 [98 Cal.Rptr.2d 44].) We observed that the "intent of the Legislature obviously was to include every child, legitimate or illegitimate, born or unborn, and enforce the obligation of support against the person who could be determined to be the lawful parent." (*People v. Sorensen, supra*, 68 Cal.2d at pp. 284–285, fn. omitted.) Further: "a reasonable man who, because of his inability to procreate, actively participates and consents to his wife's artificial insemination in the hope that a child will be produced whom they will treat as their own, knows that such behavior carries with it the legal responsibilities of fatherhood and criminal responsibility for nonsupport. . . . [I]t is safe to assume that without defendant's active participation and consent the child would not have been procreated." (*Id.* at p. 285; see *Dunkin v. Boskey, supra*, 82 Cal.App.4th at p. 190.)

We were careful in *Nicholas H.*, therefore, not to suggest that every man who begins living with a woman when she is pregnant and continues to do so after the child is born necessarily becomes a presumed father of the child, even against his wishes. The Legislature surely did not intend to punish a man like the one in *Nicholas H.* who voluntarily provides support for a child who was conceived before he met the mother, by transforming that act of kindness into a legal obligation.

But our observation in *Nicholas H.* loses its force in a case like the one at bar in which the presumed mother under section 7611, subdivision (d), acted together with the birth mother to cause the child to be conceived. In such circumstances, unlike the situation before us in *Nicholas H.*, we believe the Legislature would have intended to impose upon the presumed father or mother the legal obligation to support the child whom she caused to be born. As stated by amicus curiae the California State Association of Counties, representing all 58 counties in California: "A person who actively participates in bringing children into the world, takes the children into her home and

holds them out as her own, and receives and enjoys the benefits of parenthood, should be responsible for the support of those children—regardless of her gender or sexual orientation."

 We conclude, therefore, that Elisa is a presumed mother of the twins under section 7611, subdivision (d), because she received the children into her home and openly held them out as her natural children, and that this is not an appropriate action in which to rebut the presumption that Elisa is the twins' parent with proof that she is not the children's biological mother because she actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother, she voluntarily accepted the rights and obligations of parenthood after the children were born, and there are no competing claims to her being the children's second parent.

Elisa relies upon the Court of Appeal decisions in *Curiale v. Reagan* (1990) 222 Cal.App.3d 1597 [272 Cal.Rptr. 520], *Nancy S. v. Michele G.* (1991) 228 Cal.App.3d 831 [279 Cal.Rptr. 212], and *West v. Superior Court* (1997) 59 Cal.App.4th 302 [69 Cal.Rptr.2d 160], for the proposition that "nonbiological partners from a same-sex relationship, who have not adopted their partners' children, are deemed 'nonparents' for purposes of custody or visitation" and thus "must also be deemed nonparents for purposes of establishing child support orders for those same children." As we explain below, these decisions predated our recognition in *Nicholas H.* and *Jesusa V.* that a person with no biological relationship could be a presumed parent under section 7611, subdivision (d). Accordingly, we do not find these cases persuasive.

*Curiale* involved a situation similar to that in the present case in which two women in a lesbian relationship agreed that one of them "would conceive a child through artificial insemination and that the child would be raised by both of them." (*Curiale v. Reagan, supra,* 222 Cal.App.3d 1597, 1599.) The couple's relationship dissolved when the child was two years old, and the plaintiff filed a " 'complaint to establish de facto parent status/maternity and for custody and visitation.' " (*Ibid.*) The Court of Appeal summarily dismissed the plaintiff's reliance upon the UPA, stating "it has no application where, as here, it is undisputed defendant is the natural mother of the child. [Citation.]" (*Curiale v. Reagan, supra,* at p. 1600.) The decision, therefore, did not consider the applicability of the predecessor to section 7611, subdivision (d), which was former Civil Code section 7004 (Stats. 1987, ch. 192, § 1, p. 1155). The court concluded, without discussion or explanation: "The Legislature has not conferred upon one in plaintiff's position, a nonparent in a same-sex bilateral relationship, any right of custody or visitation upon the termination of the relationship." (*Curiale v. Reagan, supra,* 222 Cal.App.3d at

p. 1600.) But the court's reasoning was circular, because it began its analysis by assuming the plaintiff was a "nonparent" even though the issue to be decided was whether the plaintiff was a parent under the UPA.

*Nancy S.* involved two women in a lesbian relationship who had two children by artificially inseminating Nancy on two occasions. (*Nancy S. v. Michele G., supra,* 228 Cal.App.3d 831, 834.) Michele was listed on the birth certificates as the father, and the children were given Michele's family surname. The children referred to both Nancy and Michele as "mom." After the couple's relationship dissolved, Nancy filed an action under the UPA to obtain a declaration that she was the sole parent of the children. The Court of Appeal determined that Michele was not a parent under the UPA based in part on the circumstance that "[i]t is undisputed that [Michele] is not the natural mother" of the children. (*Nancy S., supra,* at p. 836.) *Nancy S.* was decided before we recognized in *In re Nicholas H., supra,* 28 Cal.4th 56, that "natural" as used in the UPA does not always mean "biological."

In *West v. Superior Court, supra,* 59 Cal.App.4th 302, two women in a lesbian relationship agreed that one of them, Barbara West, would conceive a child through artificial insemination and that the child would be raised by them jointly. When the couple's relationship ended, West's partner, Pamela Lockrem, filed an action to be declared the child's parent under the UPA. The same Court of Appeal that had decided *Curiale* simply relied upon its earlier decision without providing additional authority or analysis and concluded that Lockrem had no parental relationship with the child.

As noted above, we held in *In re Nicholas H., supra,* 28 Cal.4th 56, and *In re Jesusa V., supra,* 32 Cal.4th 588, 604, that a natural parent within the meaning of the UPA could be a person with no biological connection to the child, and the Court of Appeal in *In re Karen C., supra,* 101 Cal.App.4th 932, 938, held that a woman with no biological connection to a child could be a presumed mother under section 7611, subdivision (d). Similarly, the Court of Appeal in *In re Salvador M., supra,* 111 Cal.App.4th 1353, 1357, held that a woman who was the half sister of a child could, nevertheless, be the child's natural mother under the UPA. The courts in *Curiale v. Reagan, supra,* 222 Cal.App.3d 1597, *Nancy S. v. Michele G., supra,* 228 Cal.App.3d 831, and *West v. Superior Court, supra,* 59 Cal.App.4th 302, did not have the benefit of this authority and did not consider the applicability of section 7611, subdivision (d) regarding presumed fathers. Accordingly, these decisions do not aid our analysis and we disapprove them to the extent they are inconsistent with the present opinion.

DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.,** Concurring.—I concur in the majority's decision. I write separately to point out that, in my view, this court's recent decision *In re Nicholas H.* (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932] (*Nicholas H.*), which holds that a nonbiological father may nonetheless meet the statutory definition of a "presumed" father, makes the majority's outcome in this case a foregone conclusion.

### I.

Emily B. and Elisa B. began living as a couple in 1993. Each woman wanted to bear her own child; eventually each underwent artificial insemination with sperm from the same donor so that their offspring would be genetically related. In 1997, Elisa gave birth to a son, Chance. In 1998, Emily gave birth to twins (son Ry and daughter Kaia). Ry was born with serious health problems, including Down's syndrome. All three children were given the same hyphenated surname. As they had planned, Emily stayed home and cared for the three children, while Elisa worked to support the family. Elisa claimed all three children as her dependents for tax purposes and on an application for health insurance, and she described herself in a job interview as the mother of triplets.

In late 1999, the couple separated, but for some time Elisa continued to pay rent and living expenses for Emily and the twins. In December 1999, Emily began receiving public assistance from El Dorado County. In May 2001, Elisa told Emily that because she no longer had a full-time job she could not continue to support Emily and the twins. The next month, the county filed a petition in the superior court to determine that Elisa was a parent of the twins born to Emily, the first step in making Elisa financially responsible for them.

The trial court, relying on this court's test in *Johnson v. Calvert* (1993) 5 Cal.4th 84 [19 Cal.Rptr.2d 494, 851 P.2d 776] (the preconception intent to become a parent), ruled that Elisa had intended to bring about the birth of Emily's children, and thus her obligation to them should be "the same legal duty and responsibility of a man found to be a presumed father"—that is, a man who has received a child into his home and openly held it out as his

natural child. (Fam. Code, § 7611, subd. (d).)[1] It ordered Elisa to pay child support for the twins. Elisa successfully petitioned the Court of Appeal for writ relief. The Court of Appeal reasoned that under California's statutory scheme Elisa was neither the natural nor the adoptive mother of her partner's twins, nor could she be their father, and therefore Elisa had no legally recognized parental status with respect to the twins. Accordingly, it directed the trial court to vacate the child support order.

## II.

Under California law, a man "is presumed to be the natural father of a child" in various circumstances involving his marriage or attempted marriage to the child's mother, or if he "receives the child into his home and openly holds out the child as his natural child." (Fam. Code, § 7611, subd. (d).) Section 7650 expressly directs that "[i]nsofar as practicable," the provisions pertaining to the father and child relationship apply in determining the existence of a mother and child relationship. (§ 7650.)

In *Nicholas H.*, *supra,* 28 Cal.4th 56, this court held that a nonbiological father who receives a child into his home and holds the child out as his natural child can be the "presumed" father of the child. If a nonbiological father can by his conduct meet the statutory definition of a presumed father, then by parity of reasoning a nonbiological mother can become a presumed mother, as the majority concludes. Here, Elisa became a presumed mother of the twins to which Emily gave birth when she both received the twins into her home and openly held them out as her natural children. (§ 7611, subd. (d).)

The legal presumption of fatherhood or motherhood created by receiving and holding out the child as one's natural child "may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).) We concluded in *Nicholas H, supra,* 28 Cal.4th 56, that the action was not an appropriate one in which to allow rebuttal of the presumption, because the result there would have been to leave Nicholas fatherless.

This case too is not "an appropriate action" in which to rebut the presumption of presumed motherhood. (§ 7612, subd. (a).) The county, which since 1999 has provided the twins with public financial assistance and medical care, brought on their behalf an action in superior court to establish their parentage as a predicate to obtaining a court order requiring Elisa to pay child support. Young Ry and Kaia, no less than any other children in this state, have a right to support from *both* their parents. Those parents are

---

[1] All further statutory references are to the Family Code.

Emily, as the biological mother, and Elisa, because she meets the statutory definition of a presumed mother. To permit rebuttal of the legal presumption that Elisa is the presumed mother of the twins would leave the twins with the support of only one parent, Emily, who, until now, has been receiving financial support and medical care from the taxpayers of the county in which she and the twins reside.

Had a man who, like Elisa, lacked any biological connection to the twins received them into his home and held them out as his natural children, this case would, under this court's holding in *Nicholas H., supra,* 28 Cal.4th 56, undoubtedly have resulted in a determination that he met the statutory criteria for being the presumed father of the twins. These legal principles apply with equal force in this case, where Elisa, whom the county seeks to hold financially accountable for support of the twins, meets the statutory criteria of a presumed mother, a status that brings with it the benefits as well as the responsibilities of parenthood. The flip side of a familiar adage comes to mind: What is sauce for the gander is sauce for the goose.