KENNARD, J., Dissenting.
Unlike the majority, I would apply the controlling statutes as written. The statutory scheme for determining parentage contains two provisions that resolve K.M.’s claim to be a parent of the twins bom to E.G. Under one provision, a man who donates sperm for physician-assisted artificial insemination of a woman to whom he is not married is not the father of the resulting child. (Earn. Code, § 7613, subd. (b).)[1] Under the other provision, mies for determining fatherhood are to be used for determining motherhood “[ijnsofar as practicable.” (§ 7650.) Because K.M. donated her ova for physician-assisted artificial insemination and implantation in another woman, and knowingly and voluntarily signed a document declaring her intention not to become a parent of any resulting children, she is not a parent of the twins.
I.
In 1994, K.M. and E.G. began living together as a couple, and some months later they registered as domestic partners. E.G. had long wanted to become a mother but had been unsuccessful in conceiving. She eventually pursued in vitro fertilization, but her body failed to produce sufficient ova. Her physician then suggested that she obtain ova from K.M., her partner. K.M. orally agreed that she would donate ova, and that E.G. would be the only parent of any resulting child unless K.M. were later to become a parent through a formal second-parent adoption. K.M. evidenced her intent that E.G. was to be the sole parent by signing the ova donor form, which provided that she renounced any claim to her donated ova, a fetus, or a child bom from her ova.
K.M. donated her ova, which were fertilized with sperm from an anonymous donor and implanted in E.G., who ultimately gave birth to twin girls. The twins lived with the couple for five years. After the couple separated, K.M. petitioned the superior court for establishment of a parental relationship with the twins, and for rights to custody and visitation.
After a weeklong hearing, at which considerable evidence was presented, the superior court dismissed K.M.’s parentage action. Describing K.M.’s testimony about her misunderstanding of the ova donor form as “not always credible,” the trial court found that K.M. and E.G. had agreed “prior to the conception of the children” that E.G. would be their only parent. The court observed that E.G.’s intent to be the sole parent “responsible for the support and maintenance of any children bom” of the ova implanted in her uterus was evidenced when she signed the ova recipient form acknowledging that the “children produced” by the in vitro fertilization procedure would be her *146 children “with all the rights and privileges accompanying such status.” The court also noted that K.M. had failed to show that she had no choice but to sign the standard form provided by the in vitro fertilization clinic, and that she could not have donated her ova under a different agreement in which she was “designated” as “an intended parent” of any child bom to E.G. Hence it ruled that K.M. had voluntarily relinquished any claim to being a mother of any children bom to E.G.
The court further ruled that K.M. did not meet the statutory definition of a “presumed” mother (§7611, subd. (d); Elisa B. v. Superior Court (2005) 37 Cal.4th 108, 125 [33 Cal.Rptr.3d 108, 117 P.3d 660] (Elisa B.)), because she had failed to meet both prongs of the statutory test: receiving the children into her home, and holding them out as her natural children. Although K.M. had received the twins into her home, she had not held them out as her natural children;[2] indeed she had not disclosed to others “her genetic connection” to the twins until 1999, when the couple’s relationship began to falter.
The Court of Appeal affirmed the trial court.
II.
The Court of Appeal held that K.M. had made a voluntary and informed choice to donate her ova to E.G., and that KM.’s status with respect to any child bom as a result of the ova donation was analogous to that of a sperm donor, who, by statute, is treated as if he were not the natural father of any child conceived as a result of the sperm donation. “The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor’s wife is treated in law as if he were not the natural father of a child thereby conceived.” (§ 7613, subd. (b).) By analogy I would apply that statute here. Section 7650 states that “[i]nsofar as practicable” the provisions “applicable” to a father and child relationship are to be used to determine a mother and child relationship.
Here it is “practicable” to treat a woman who donates ova to a licensed physician for in vitro fertilization and implantation in another woman,[3] in the same fashion as a man who donates sperm to a licensed physician for artificial insemination of a woman to whom he is not married. Treating male *147 and female donors alike is not only practicable, but it is also consistent with the trial court’s factual finding here that K.M. intended “to donate ova to E.G.” so that E.G. would be the sole mother of a child bom to her.
As the majority here explains, California’s Legislature has drafted the sperm donor statute in such a way as to allow unmarried women to use artificial insemination to conceive, and to permit them to become the sole parent of any child so conceived, if they use sperm that the donor has provided to a licensed physician. (Maj. opn., ante, at p. 140.) Here, E.G. used sperm donated in that fashion, ensuring that the sperm donor would have no claim of fatherhood to any child to whom she gave birth. This she was entitled to do under California law. (Jhordan C. v. Mary K. (1986) 179 Cal.App.3d 386, 392 [224 Cal.Rptr. 530].)
I recognize that California law does not expressly address the maternal status of ova donors. But, as I have explained in the past, the Uniform Parentage Act, as codified in our Family Code, remains “the only statutory guidance this court has in resolving this case.” (Johnson v. Calvert (1993) 5 Cal.4th 84, 112 [19 Cal.Rptr.2d 494, 851 P.2d 776] (dis. opn. of Kennard, J.) (Johnson).) Accordingly, as I said earlier, I would apply the sperm donor statute to women who donate their ova in compliance with section 7613, subdivision (b). As the trial court here explained: K.M.’s “position was analogous to that of a sperm donor, who is treated as a legal stranger to the child if he donates sperm through a licensed physician and surgeon.” Like the trial court, I see “no reason to treat ovum donors as having greater claims to parentage than sperm donors.”
The analogy between sperm and ova donors is not new. Indeed, in Johnson, supra, 5 Cal.4th at page 93, footnote 10, this court signalled its view that an ova donor would not be treated as the child’s mother. Johnson held that “in a true ‘egg donation’ situation, where a woman gestates and gives birth to a child formed from the egg of another women with the intent to raise the child as her own, the birth mother is the natural mother under California law.” {Ibid.) Nearly two years after that decision, E.G. in this case undertook in vitro fertilization with ova from K.M.
In the 12 years since this court’s decision in Johnson, supra, 5 Cal.4th 84, an unknown number of Californians have made procreative choices in reliance on it. For example, in the companion case of Kristine H. v. Lisa R. (2005) 37 Cal.4th 156, 161 [33 Cal.Rptr.3d 81, 117 P.3d 690] a lesbian couple obtained a prebirth stipulated judgment declaring them to be “ ‘the *148 joint intended legal parents' ” (italics added) of the child bom to one of them, language they presumably used in order to bring themselves within Johnson where the preconception intent to become a parent is the determinative inquiry. (Johnson, supra, 5 Cal.4th at p. 93.) We do know that prebirth judgments of parentage on behalf of the nonbiologically related partner of a child’s biological parent have been entered in this state, and that such judgments were touted to same-sex couples as less expensive and time-consuming than second parent adoption. (Doskow, The Second Parent Trap: Parenting For Same-Sex Couples in a Brave New World (1999) 20 J. Juv. L. 1, 21, fns. 117 & 118 [citing judgments entered in San Francisco, Los Angeles, and San Luis Obispo Counties]; see also Mak, Partners in Law, 24 L.A. Law. (July-Aug. 2001) 35, 38, 40.) How will today’s majority holding affect the validity of the various procreative choices made in reliance on Johnson? The majority’s decision offers no answers.
The majority’s desire to give the twins a second parent is understandable and laudable. To achieve that worthy goal, however, the majority must rewrite a statute and disregard the intentions that the parties expressed when the twins were conceived. The majority amends the sperm-donor statute by inserting a new provision making a sperm donor the legal father of a child bom to a woman artificially inseminated with his sperm whenever the sperm donor and the birth mother “intended that the resulting child would be raised in their joint home,'' even though both the donor and birth mother also intended that the donor not be the child’s father. (Maj. opn., ante, at p. 142, italics added.) Finding nothing in the statutory language or history to support this construction, I reject it. Relying on the plain meaning of the statutory language, and the trial court’s findings that both K.M. and E.G. intended that E.G. would be the only parent of any children resulting from the artificial insemination, I would affirm the judgment of the Court of Appeal, which in turn affirmed the trial court, rejecting K.M.’s claim to parentage of the twins bom to E.G.

 All further statutory references are to the Family Code.

 This case is factually distinguishable from the companion case of Elisa B. because here K.M. did not, by her behavior after their birth, meet the statutory test triggering the presumption (§ 7611, subd. (d)) that she was a presumed mother of the twins. (Elisa B., supra, 37 Cal.4th at pp. 119-122.)

 K.M. and E.G. were registered in San Francisco as domestic partners in 1995 at the time of the twins’ birth. On March 30, 2001, E.G. filed a notice with the Clerk of the City and County of San Francisco dissolving the domestic partnership. As of January 1, 2005, domestic partners *147 who are registered with the California Secretary of State have the same “rights and obligations” to “a child of either of them” as do spouses. (§ 297.5, subd. (d).) Obviously, this new statute has no application here.