Filed 3/16/16  Brent L. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| BRENT L., | |
|     Petitioner, | |
|       v. | |
| THE SUPERIOR COURT OF ORANGE COUNTY, | G052991 |
| | (Super. Ct. No. DP025633) |
|     Respondent; | O P I N I O N |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
|     Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Gary L. Moorhead, Judge. Petition denied.

Sharon Petrosino, Interim Public Defender, Laura Jose, Assistant Public Defender, Rachel A. Novak and Dennis M. Nolan, Deputy Public Defenders for Petitioner.

Nicholas S. Chrisos County Counsel and Karen L. Christensen, Deputy County Counsel for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Tina Stevens for the Minor.

\*              \*              \*

## I.  BACKGROUND

In 2014, then four-year-old Wyatt and his younger half-brother Johnny were living with their mother B.N., and Johnny's father, Robert, in a motel on Lincoln Avenue, a major thoroughfare in west Orange County.  B.N. and Robert had married in June of 2013.  On November 1, 2014, someone noticed Wyatt and Johnny were alone and unsupervised, and called the police.  The police found B.N. and Robert asleep in their motel room.  Police also found drug paraphernalia in the room, and both admitted using heroin the night before.  Wyatt and Johnny were taken into protective custody by the police.  A detention hearing was held five days later, at which the two boys were formally ordered detained at Orangewood Children's Home.  At the detention hearing B.N. told the court Johnny is Robert's natural son, but Wyatt is the son of petitioner Brent L.

Brent was not present at the detention hearing in November 2014, nor was he present at the jurisdictional hearing the next month (Brent was incarcerated at the time).  In January 2015, pursuant to stipulation of "all counsel" – which did not include counsel for Brent as one had yet to be appointed for him – the court found that Robert was the "presumed father" of Wyatt.  A dispositional hearing was held in March 2015, at which the court approved a case plan contemplating reunification of Wyatt with B.N. and Robert and the children placed in a foster home.  The court scheduled a six-month review for August 2015.

The six-month review was actually conducted in several stages from August 2015 through December 2015.  On September 16, 2015, preparatory to a hearing that would be conducted September 23, the court appointed counsel for Brent, and authorized funds for paternity testing.  Brent showed up for the September 23, 2015

2

hearing (the only hearing in this matter where he was physically present). At that hearing, Brent's counsel told the court Brent had signed a "declaration of paternity" and was "asking to be found [the] presumed [father] as to Wyatt." At the request of *Robert's* counsel, though, the court decided to defer the issue of Brent's paternity until the next hearing, then scheduled for November 19, 2015.

The November hearing was continued to December 16, 2015. By that time, the paternity testing had been completed and confirmed B.N.'s initial report that Brent was indeed Wyatt's biological father. Concomitantly, at the December hearing, it was also found that B.N. and Robert had made no progress on their own reunification plans, so the court terminated their reunifications services. (The merits of that decision are not before us in this proceeding.)

Brent had been released from custody by the December hearing, but he did not attend. His counsel asked for a continuance, and told the court that while Brent had been released from custody sometime after November 19, he had not kept in touch with his counsel, despite being told "multiple" times that contact information was needed after he got out of jail. Though the continuance motion was denied, the trial court expressly deferred any finding that Brent had "biological father status" because he had not "present[ed] himself to the court." The court scheduled a hearing pursuant to Welfare and Institutions Code section 366.26 on April 12, 2016.[1]

In a petition for writ of mandate, Brent's counsel asks this court to do something unusual – vacate the mere *deferral of a formal finding* of what the record, with the December 2015 DNA tests, now shows to be obvious: Brent is Wyatt's biological father. Brent's counsel speculates that Brent may not be allowed to participate at the upcoming April 12, 2016 section 366.26 hearing and, in consequence, is likely to suffer termination of his parental rights. Moreover, says his counsel, absent a finding he is

---

[1] All undesignated statutory provisions are to the Welfare and Institutions Code.

3

biologically Wyatt's father, Brent's relatives may not be considered for placement.  We deny the petition:  any error was harmless even under the strictest standard.

## II.  DISCUSSION

A quick primer on the three categories of fatherhood under California law is necessary to understand the extent (and limits) of Brent's paternal rights.  The three categories are, in descending order of strength of paternal rights:  presumed, natural, and alleged.

The strongest level of paternal rights is that of a *presumed* father.  Only presumed fathers are *entitled* to receive reunification services in juvenile dependency proceedings.  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 (*Zacharia D.*) ["we conclude that only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services under section 361.5"].)  Significantly, presumed father status does not entail *any* necessary biological connection to the child, though it is common that presumed fathers are also biological fathers.  (See *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 125 ["a person with no biological relationship could be a presumed parent under section 7611"].)  While this might at first seem counterintuitive, one of the basic ideas of presumed fatherhood is to preserve existing family units.  Section 7611 retains many of the ideas from the old pre-DNA era common law of legitimacy, which made a child born to an existing married couple presumptively legitimate.[2]

The next level down, that of a *natural* father, is a man who really is the biological father of the child, but who does not come within a category of section 7611.  As the Supreme Court stated in *Zacharia D., supra*, 6 Cal.4th at p. 449, footnote 15:  a

---

[2]     We must, however, remark upon a qualification that can undo even presumed father status, at least when there is no biological connection.  One case has held that truly reprehensible conduct can actually rebut the "presumption" of fatherhood:  In *In re T.R.* (2005) 132 Cal.App.4th 1202, the court concluded that a man who clearly fell within presumed father status – he had lived with the child and her mother for seven years and had even married the mother within that period of time – *still* could lose presumed father status based on evidence that he was a registered sex offender and had molested the dependent child.   (See *id*. at p. 1212.)

4

"biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status as defined in" the Civil Code.  Natural fathers *may* be given reunification services at the juvenile court's discretion, *if* the court determines the services would "benefit" the child.  (§ 361.5, subd. (a).[3])

The weakest level of paternal rights is that of an *alleged* father.  Again, our high court in *Zacharia D.* is plain:  "A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an 'alleged' father."  (*Zacharia D.*, *supra*, 6 Cal.4th at p. 449, fn. 15.)

Alleged fatherhood is a kind of waiting room.  "An alleged father does not have a current interest in a child because his paternity has not yet been established."  (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1406 (*O.S.*).)  And *current* is the key idea.  For an alleged father of a dependent child, any possibility of establishing parental rights (e.g., reunification services) is dependent upon his elevation to the next level – natural father – where biological parenthood is established.

An alleged father is entitled to due process notice in order that he might have the *opportunity* to change his status.  As the appellate court said in *O.S.*:  "An alleged father in dependency proceedings is entitled to notice, because notice provides him an opportunity to appear and assert a position and attempt to change his paternity status."  (*O.S., supra,* 102 Cal.App.4th at p. 1408.)  And in that regard, a statute, section 316.2, and a rule of court implementing that statute, rule 5.635 of the California Rules of Court, come into play.[4]  Section 316.2 and rule 5.635 provide a set of instructions to juvenile courts as to how to proceed given the existence of an alleged father.

---

[3]    Which in pertinent part provides:  "Upon a finding and declaration of paternity by the juvenile court or proof of a prior declaration of paternity by any court of competent jurisdiction, the juvenile court may order services for the child and the biological father, if the court determines that the services will benefit the child."

[4]    All undesignated references to any rule of court are to the California Rules of Court.

Here is a quick précis of the way the statute and rule work: At the detention hearing "or as soon thereafter as practicable," the juvenile court is required to inquire of the mother as to the existence of any alleged fathers.[5] If a man is so identified, he is to be given notice "at his last and usual place of abode by certified mail" of the fact he is, or might be, an alleged father, and the notice must include a particular form – the JV-505 form – by which he can assert he is the father of the dependent child. (§ 316.2, subd. (b); see *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1121 ["Form JV–505 specifically informs an alleged father that he can compel the court to determine his paternity, and gives him the means to request appointment of counsel, state his belief that he is the father of the child, and ask that the court enter judgment of paternity."].) Moreover, if the local child support agency so states, or if the court itself determines there has been no "prior determination of parentage of the child," the juvenile court "must take appropriate steps to make such a determination."[6] But an alleged father cannot just be passive. A court rule *requires* the alleged father and his counsel to "complete and submit" the JV-505 form.[7] There is no JV-505 form in the record before us.

The best case scenario that can be articulated in Brent's favor would be to assume that on "Day 1," the detention hearing, the trial judge determined that Brent was likely the biological father of Wyatt, arranged for a DNA test, and had him sent a JV-505 form.[8] And let us further assume that Brent and his counsel would have completed the JV-505 form and submitted it almost immediately, so that by some very early date, perhaps as early as November 2014, there would have been a trial court determination that Brent is the natural father of Wyatt.

---

[5]     Section 316.2, subdivision (a).

[6]     Rule 5.635(e).

[7]     Rule 5.635(e)(1).

[8]     Significantly, Brent's petition points to no evidence he *wasn't* given proper notice or sent a JV-505 form from the time of the detention hearing. As a matter of appellate procedure, of course, the presumption in the face of such lacuna is that he *was* given notice and sent such a form.

6

It would make no difference.[9]  Even under such a scenario, Brent would not have been offered reunification services, even were we to apply the strictest possible beyond-a-reasonable-doubt standard borrowed from the criminal law.  (See *Chapman v. California* (1967) 386 U.S. 18, 24.)  Brent is a registered sex offender.[10]  Brent's rap sheet includes, besides the usual plethora of arrests, detentions and convictions for drug related offenses, convictions for robbery, petty theft, sexual penetration, assault and battery, grand theft, forgery, and carrying a concealed dirk or dagger.  In our record, in fact, Brent's criminal history spans more than 35 pages.  In that light, it is not surprising his petition makes no argument, nor points to a scintilla of evidence, that reunification services would even theoretically benefit Wyatt.  And such benefit is a *prerequisite* for such services under section 361.5 for natural fathers who are not presumed fathers.[11]

If reunification was a nonstarter, what about the possibility of some sort of placement with someone otherwise related to Brent?  Brent raises that problem, but his petition presents no evidence of any possibility of relative placement.  What's more, the county counsel's opposition to Brent's petition notes there is actually affirmative evidence that there is no realistic possibility of relative placement.  In preparation for the jurisdictional hearing in December 2014, a social worker spoke with Brent's mother.  She has lung cancer, is living in a senior home, and said she would see and get back to the

_____

9    There is a line of cases, *In re Paul H.* (2003) 111 Cal.App.4th 753, *In re J.H.* (2011) 198 Cal.App.4th 635, and *In re B.C.* (2012) 205 Cal.App.4th 1306 which present variations on the theme of trial court delay in determining biological paternity.  Because here no error in that regard could possibly be prejudicial, we need not discuss them beyond this footnote.

10    Subdivision (a) of section 361.5 requires the provision of reunification services to parents whenever a child is removed from their custody.  Subdivision (b) then counters that presumption by spelling out a number of situations where parents "need not" be provided such services.  These include subdivision (b)(12) [convicted of a violent felony]; subdivision (b)(13) [history of chronic drug use plus evidence the parent has resisted prior court-ordered treatment]; and subdivision (b)(16) [parent has been required by the court to register as a sex offender].

11    And, to cite one of the most distasteful aspects of our record, B.N. told a social worker (as reflected in a detention report) than when B.N. was pregnant with Wyatt, Brent took a steak knife and threatened to "cut the baby out of her."  Such evidence wholly disqualified Brent from ever attaining the status of a *Kelsey S.* father regardless of his biological parenthood.  (See *Adoption of Michael H.* (1995) 10 Cal.4th 1043 [mere delay in asserting commitment to parenthood sufficient to reverse finding biological father was entitled to *Kelsey S.* status].)

7

social worker on the topic of whether any family members were available. The record shows nothing came of that follow-up.

### III. DISPOSITION

In sum, even if the trial court had gone the extra mile in formally finding Brent to be the biological father of Wyatt, nothing would have come of it. This is a case of harmless error in the juvenile dependency context. (See *In re Kobe A., supra*, 146 Cal.App.4th at pp. 1122-1123 [error harmless where there was no possibility reunification would be found to be in the child's best interest]; *In re Joshua R.* (2002) 104 Cal.App.4th 1020, 1026 [error harmless where the court found reunification was not in the child's best interest].) The petition is, accordingly, denied.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

8