142 Nev., Advance Opinion 46



FILED

Jun 18 2026
ELIZABETH A. BROWN
CLERK OF SUPREME COURT

## IN THE COURT OF APPEALS OF THE STATE OF NEVADA

MARY LORENZO,
Appellant,
vs.
PIERRE GENDEBIEN,
Respondent.

No. 90082-COA

Mary Lorenzo appeals from a district court order dismissing a complaint regarding maternity and child custody.  Eighth Judicial District Court, Family Division, Clark County; Mari D. Parlade, Judge. [1]

*Reversed and remanded.*

Candelaria Law Group and Amber L. Candelaria, Las Vegas,
for Appellant.

Kelleher & Kelleher, LLC, and R. Nathan Gibbs, Henderson,
for Respondent.

_____

BEFORE THE COURT OF APPEALS, BULLA, C.J., and GIBBONS and WESTBROOK, JJ.

_____

[1]The Honorable Kathy Hardcastle, Senior Judge, presided over the hearing on respondent's motion to dismiss and orally granted the motion. Judge Parlade signed the written order of dismissal and presided over all subsequent district court proceedings.

*OPINION*

By the Court, GIBBONS, J.:

The Uniform Parentage Act (UPA) was promulgated by the Uniform Law Commission (ULC) in 1973 to encourage states to adopt statutory frameworks that reflect evolving societal norms in family life and provide a more unified and equitable model of parental recognition, regardless of marital status. Modeled on the 1973 UPA, the Nevada Parentage Act (NPA), enacted in 1979 and codified in NRS Chapter 126, remains the framework by which a person may establish legal parentage of a child in Nevada. [2]

Since that time, most jurisdictions have moved away from laws that tie parental recognition exclusively to biological connection, instead recognizing alternative pathways to parenthood. We now join this trending majority on parental recognition, holding that Nevada's presumptive parentage statutes, as adopted by the NPA and enumerated under NRS Chapter 126, are equitable in nature and shall not be restricted on the basis of sex, marital status, or biological connection except in limited circumstances. Under NRS 126.231, "*any interested party* may bring an action to determine the existence of a mother and child relationship," and

---

[2]"To determine parentage in Nevada, courts must look to the Nevada Parentage Act, which is modeled after the Uniform Parentage Act (UPA). The Nevada Parentage Act is 'applied to determine legal parentage.'" *St. Mary v. Damon*, 129 Nev. 647, 652, 309 P.3d 1027, 1031 (2013) (quoting *Russo v. Gardner*, 114 Nev. 283, 288, 956 P.2d 98, 101 (1998)).

The NPA, however, does not reflect amendments to the UPA adopted by the ULC in 2002 and 2017. Our opinion does not rely on any of these amendments, and most of the caselaw on which we rely predates the ULC's 2017 revisions and amendments and is not affected by them.

the statutes under which paternity may be determined apply here "[i]nsofar as practicable" to maternity actions. (Emphasis added.)

Yet gestational agreements involving a surrogate parent present procedural complexities that are difficult to reconcile with Nevada's equitable notion of standing in paternity, maternity, and custody actions. Under NRS Chapter 126, if two persons are the intended parents of a child, both of those persons "must be parties to the gestational agreement" for parental status and rights to properly vest. *See* NRS 126.710(2). However, a related question remains as to *when* such parental rights may vest upon execution of a gestational agreement, as several subsections of NRS Chapter 126 provide the temporal phrasing "immediately upon the birth of the child," *see* NRS 126.720(1)(a)-(d), but separate parentage provisions contemplate claims made by interested persons not party to the gestational agreement, *see* NRS 126.051(1); NRS 126.071(1).

One reading of the "immediately upon birth" language is that intended parents become the child's legal parents at birth, their parental and custodial rights attach at that moment, and they thereafter hold those rights indefinitely. However, even with that interpretation, the question remains whether another person may later acquire parental status by judicial pronouncement without the consent of the intended parent to a gestational agreement.

As we explain in this opinion, the phrase "immediately upon birth" protects the rights of the intended parent but does not categorically bar an interested party from seeking parentage or custody merely because they were not included as an intended parent within the gestational agreement. Indeed, other provisions within NRS Chapter 126 expressly contemplate alternative pathways to establishing presumptive parentage

3

status. Therefore, because of the statutory framework and persuasive caselaw, we now hold that a putative parent has standing to bring an action to determine the existence of a parent-child relationship and, once standing is established, may pursue legal recognition of that relationship by invoking and attempting to prove presumptive parentage status, even when that individual is not included in a gestational agreement as an intended parent, unless they consented to be omitted as an intended parent.

Further, even if the putative parent satisfies the applicable requirements under NRS 126.051(1) for maternity and establishes presumptive parentage status, the district court must allow the parent named in the gestational agreement the opportunity to rebut the presumptive parent's claim. *See* NRS 126.051(3) (providing that presumptive parentage may be rebutted in "an appropriate action"). If the district court determines the presumption is not appropriately rebutted, then the court shall consider the presumptive parent as holding full parentage status and move forward to determine the custody arrangement that is in the best interest of the child. But if the district court finds that the parentage presumption is appropriately rebutted, then judgment must be entered against the putative parent.

In this case, which involves a gestational agreement with a surrogate parent, appellant invoked NRS 126.051(1) to establish standing to bring a maternity and custody action against respondent. In her complaint, appellant alleged sufficient facts to support her claim that she was the presumptive mother of the minor child, giving her standing as an interested party to bring a parentage claim. Yet, the district court granted respondent's motion to dismiss appellant's complaint for lack of standing because she had no genetic link to the minor child, was not married to the

4

child's biological father, and was not included as an intended parent in the gestational agreement. This was error.

On a motion to dismiss under NRCP 12(b)(5), the putative parent's allegations are presumed true, and if sufficient to establish standing, a parentage claim must survive dismissal until such time that an evidentiary hearing is held to determine whether a rebuttable presumption of parental status under NRS 126.051(1) is established. If the presumption is established by the putative parent, then the district court must determine if that presumption is appropriately rebutted pursuant to NRS 126.051(3). Because the allegations in appellant's complaint, if proven, set forth sufficient facts to establish a rebuttable presumption of maternity under our clarified reading of NRS 126.051(1), we reverse the district court's order and remand this matter for further proceedings consistent with this opinion.

*FACTS AND PROCEDURAL HISTORY*

Appellant Mary Lorenzo and respondent Pierre Gendebien began a romantic and cohabiting relationship in 2016. In May 2017, Gendebien entered into a gestational agreement to have a child via surrogate. The surrogate was implanted with Gendebien's sperm and an egg from an anonymous donor. The agreement listed Gendebien as the sole intended parent, and the space for the mother's name and signature was left blank. Per the agreement, Gendebien assumed full legal custody and "sole responsibility for" the child upon his birth.

In February 2018, while Gendebien and Lorenzo were in a relationship and living together, Gendebien obtained a court order establishing sole parentage, apparently without Lorenzo's participation. The order directed the Office of Vital Records to leave the mother's name blank on the child's birth certificate.

The child, A.G., was born in June 2018 and took the father's last name. Gendebien and Lorenzo received A.G. into their home and raised him until their relationship ended in November 2021 when they separated. At first, Gendebien and Lorenzo had an informal timeshare agreement for equal time with respect to A.G., but Gendebien gradually reduced Lorenzo's access to the child and eventually cut off access altogether.

In September 2022, Lorenzo filed a complaint to establish maternity and sought joint legal and physical custody over A.G. Lorenzo's complaint alleged that she and Gendebien held her out as a parent before the birth and regarded her as A.G.'s parent from the time of his birth until Gendebien cut off her access to A.G. She also alleged that she had been in a cohabiting relationship with Gendebien from 2016 to November 2021 and that Gendebien had promised to add her name to A.G.'s birth certificate.

Gendebien moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to NRCP 12(b)(5), arguing that Lorenzo had no legal basis to establish maternity or obtain custody as she did not give birth to A.G., did not adopt A.G., did not consent to or participate in engaging a surrogate for the reproductive process, was not married to him, and was not a party to the gestational agreement.

Lorenzo opposed the motion to dismiss, arguing that her complaint set forth sufficient facts establishing a rebuttable presumption of maternity pursuant to NRS 126.051(1), as some of the presumptions of paternity enumerated in that statute applied to her situation. Specifically, she emphasized that pursuant to NRS 126.051(1)(b), she had lived with Gendebien (A.G.'s natural father) for more than six months before the period of conception and continued to cohabit with him through the period of pregnancy. She further argued that she established a rebuttable

6

presumption of maternity because she received A.G. into their home and they openly held him out as her child pursuant to NRS 126.051(1)(d). Lorenzo also raised the doctrine of equitable adoption, arguing that she could establish maternity under this theory because she reasonably and foreseeably relied to her detriment on Gendebien's promise that she would eventually be added to A.G.'s birth certificate.

Gendebien replied, not by disputing Lorenzo's factual allegations, but by arguing that the paternity presumptions in NRS 126.051(1) were inapplicable to a maternity action. Thus, he asserted Lorenzo could not establish maternity by living with Gendebien for six months before conception and continuing to cohabit with him through the period of pregnancy or by receiving A.G. into her home and openly holding him out as her child. Further, Gendebien contended that Lorenzo did not dispute the validity of the gestational agreement and that the existence of a valid gestational agreement controls the issue of parentage. As the sole intended parent listed on the gestational agreement, Gendebien argued that he was the only person with parental rights over A.G., and no one else could move to establish parentage.

Gendebien additionally argued in his reply that Lorenzo was barred from raising the issue of equitable adoption because she did not plead it in her complaint. He asserted that the equitable adoption doctrine was inapplicable, at any rate, because a promise to be added to a child's birth certificate is different from a promise to adopt.

After a hearing on the motion in October 2022, the district court dismissed Lorenzo's complaint to establish maternity and custody but

allowed a claim for nonparent visitation to proceed.[3] The written order stated that the presumptions of parentage were "overcome and negated" because Lorenzo was not A.G.'s biological mother, did not carry A.G., and did not donate the egg. The district court also found that Lorenzo, as Gendebien's former girlfriend (i.e., not a domestic partner or spouse) lacked standing to bring a maternity action because they were not married nor did she sign the gestational agreement. As it found these reasons sufficient to dismiss Lorenzo's custody action, the court noted that there was no need to specifically rule on the applicability of Nevada's paternity presumption statutes as to the presumptions of maternity as asserted by Lorenzo.[4]

Lorenzo moved for reconsideration, arguing that the district court misapplied the law in finding that she lacked standing. She also contended that the court erred by assuming that a genetic link is required to establish maternity. In response, Gendebien argued that the reconsideration standard had not been met because Lorenzo did not proffer any authority in her reconsideration motion that was not already considered by the district court.

---

[3]The district court ruled on Gendebien's motion to dismiss at the close of the October 2022 hearing. A written order was issued in January 2023—entitled "Order From 10/18/2022 Hearing"—and notice of entry was filed in February 2023.

[4]Lorenzo appealed from the district court's October 2022 ruling and January 2023 order, but the supreme court dismissed her appeal as premature because the district court's ruling and order did not constitute a final appealable judgment or order pursuant to NRAP 3A(b)(1) or NRAP 3A(b)(7), as the district court had not yet reached a decision with respect to her request for nonparent visitation. *See Lorenzo v. Gendebien*, No. 87318, 2024 WL 223710 (Nev. Jan. 19, 2024) (Order Dismissing Appeals).

Before the district court ruled on her motion for reconsideration, Lorenzo also moved for relief pursuant to NRCP 52 and 59. Lorenzo moved for the court to alter or amend its judgment to find that she set forth facts that established rebuttable presumptions of maternity under NRS 126.051(1)(b) and (1)(d) and argued in the alternative that custody could be awarded to her as a nonparent. She attached numerous affidavits from friends, family, and acquaintances to this motion, all detailing the closeness of the relationship between Lorenzo and A.G. and supporting Lorenzo's claim that she was held out as A.G.'s mother. She also asserted that she was unaware of the written gestational agreement until after the filing of her complaint in the present case. Gendebien opposed both motions and reiterated his argument that Lorenzo had no basis to establish maternity or seek custody because she was not listed as an intended parent on the gestational agreement that the district court had already found valid and enforceable.

Following a hearing, the district court denied both motions in August 2023, finding that Lorenzo had failed to plead a cause of action because the gestational agreement controlled the issue of maternity. It further found that Lorenzo did not plead "in such a way to meet the

elements of a claim for equitable adoption of [A.G.]."[5]  The district court, however, provided Lorenzo with another opportunity to seek nonparent visitation in light of its orders denying Lorenzo maternity and custody.

The district court held an evidentiary hearing on Lorenzo's request for nonparent visitation in September 2024 and subsequently denied it in an "Amended Findings of Fact and Conclusions of Law & Final Orders," issued in December 2024.  The court determined that Lorenzo had not rebutted the presumption against nonparent visitation under NRS 125C.050(4) by providing clear and convincing evidence that nonparent visitation would be in A.G.'s best interests.  Lorenzo now appeals from that order, solely challenging the district court's grant of Gendebien's motion to dismiss her complaint for maternity and custody pursuant to NRCP 12(b)(5).

*ANALYSIS*

On appeal, Lorenzo argues that the district court erred in finding that she lacked standing to maintain her custody action because she was merely a "girlfriend" of A.G.'s father and shared no biological link with A.G.  Lorenzo further contends that, under NRS 126.051, Nevada's paternity statutes must apply equally to maternity actions —providing her

---

[5]Specifically, the district court ruled that Lorenzo did not plead a claim for equitable adoption and Lorenzo only argues that Gendebien agreed to add her name to the child's birth certificate, not that he agreed she could adopt the child.  Lorenzo, however, failed to cite any relevant authority below or on appeal demonstrating that an agreement to add a name to a birth certificate has the same legal effect as a promise to allow an adoption.  Therefore, we discern no error in the district court's ruling on this issue and do not address it further.  *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an argument that is not cogently argued or lacks the support of relevant authority).

with the requisite standing for her maternity and custody action to survive NRCP 12(b)(5) dismissal even if she was not a party to a gestational agreement. Gendebien responds that the district court correctly dismissed Lorenzo's complaint for want of standing, noting that Lorenzo had no biological link to A.G. and was not a party to the gestational agreement. Gendebien further submits that NRS Chapter 126 provides no basis for her to invoke paternity presumption statutes equally to maternity actions.

*Standard of review*

Motions to dismiss pursuant to NRCP 12(b)(5) are subjected to a "rigorous standard of review on appeal." *Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224, 227-28 , 181 P.3d 670, 672 (2008). This court presumes the truth of a plaintiff's factual allegations and draws all inferences in favor of the plaintiff. *Id*. at 228, 181 P.3d at 672. "[A plaintiff's complaint] should be dismissed only if it appears beyond a doubt that it could prove no set of facts, which, if true, would entitle it to relief." *Id*. While plaintiffs must set forth facts supporting a legal theory, they need not correctly identify the legal theory upon which they rely. *Droge v. AAAA Two Star Towing, Inc*., 136 Nev. 291, 308, 468 P.3d 862, 878 (Ct. App. 2020). A district court's grant of a motion to dismiss is reviewed de novo. *Zohar v. Zbiegien*, 130 Nev. 733, 736, 334 P.3d 402, 404 (2014). An appellate court reviews the dismissal of a complaint for lack of standing under the same de novo standard as dismissal for failure to state a claim. *Citizens for Cold Springs v. City of Reno* , 125 Nev. 625, 629, 218 P.3d 847, 850 (2009); *Shoen v. SAC Holding Corp.* , 122 Nev. 621, 634, 137 P.3d 1171, 1180 (2006) (observing that when a plaintiff lacks standing, it is appropriate to dismiss the complaint for failure to state a claim upon which relief may be granted), *abrogated on other grounds by Guzman v. Johnson* , 137 Nev. 126, 483 P.3d 531 (2021).

*Lorenzo has standing to pursue her claim for parentage*

The district court ruled that Lorenzo did not have standing to bring a complaint for parental rights for several reasons , including Lorenzo's lack of marital status with Gendebien, her lack of biological connection to A.G., and the omission of her name as an intended parent from the gestational agreement.  We address all of these issues in turn.

*Impact of marital status and genetics*

NRS 126.231 permits "[a]ny interested party" to "bring an action to determine the existence of a mother and child relationship." The Nevada Supreme Court has held that an interested party for purposes of the Nevada Parentage Act is "someone with a direct personal stake, either financial or social, in establishing or disestablishing the [parental] relationship." *In re Est. of Murray*, 131 Nev. 64, 71, 344 P.3d 419, 424 (2015) (addressing standing in the context of an action to determine paternity under NRS 126.071). "[A] determination of parentage rests upon a wide array of considerations rather than genetics alone." *St. Mary v. Damon*, 129 Nev. 647, 653, 309 P.3d 1027, 1032 (2013).

Lorenzo alleged in her complaint that (1) she and Gendebien had an agreement that she would be added to A.G.'s birth certificate; (2) she, Gendebien, and A.G. lived together for years as a family from before A.G.'s birth until November 2021, and she had a close and bonded relationship with A.G.; (3) she and Gendebien continuously held her out as A.G.'s mother; and (4) she and Gendebien had an equal time share with A.G. for several months following their separation. While Gendebien accurately points out that Lorenzo lacks a genetic link to A.G., NRS 126.051 and NRS 126.231 do not restrict maternity actions to only those with a genetic link to the child. *Cf. Rosie M.*, 138 Nev. 539, 542-43, 512 P.3d 758, 762-63 (2022) (holding NRS 126.051(2) creates a conclusive presumption of fatherhood when a blood or genetic test shows a 99-percent match and that a putative father with a genetic link to the child prevails over a putative father without a genetic link); *see also* NRS 128.016 (stating a putative father "means a person who is or is alleged or reputed to be the father" of a child born out of wedlock).

13

Assuming, as we must, that Lorenzo's factual allegations are true, they establish that she had a clear personal stake in her relationship with A.G. as his putative mother, as the person that appeared to be, was reputed to be, and fulfilled the role of A.G.'s mother, even without a genetic link to him. She, therefore, by definition, has standing to request a determination of maternity under NRS 126.231. And unlike in *Rosie M.*, no person is claiming a genetic link to A.G. other than Gendebien.

*Impact of Nevada's presumptive parentage statutes*

We next address whether Nevada's presumptive parentage statutes, notably NRS 126.051(1)(b) and (1)(d), may be equally applied to a maternity action as practicable. Lorenzo argues that Nevada's parentage presumptions under NRS 126.051 should apply to all putative parents, regardless of sex or gender. Gendebien counters that those presumptions are primarily used to determine paternity and are inapplicable to Lorenzo's maternity action.

Because of the fundamental rights to which biological parents are entitled, any encroachment on the rights of such parents and, especially, any test to expand who is a parent should be appropriately narrow, as we address below. *See Troxel v. Granville*, 530 U.S. 57, 66-67 (2000) ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children . . . . The Washington Supreme Court had the opportunity to give [the nonparental visitation statute] a narrower reading, but it declined to do so."). NRS 126.051(1) enumerates a list of disjunctive factors by which paternity may be rebuttably presumed. These factors also apply to actions to determine maternity, "[i]nsofar as practicable." NRS 126.231. Lorenzo identifies two provisions of NRS 126.051(1) that she argues apply to her maternity action.

14

First, NRS 126.051(1)(b) states that "[a] man is presumed to be the natural father of a child if . . . [h]e and the child's natural mother were cohabiting for at least 6 months before the period of conception and continued to cohabit through the period of conception." Second, NRS 126.051(1)(d) states that "[a] man is presumed to be the natural father of a child if . . . [w]hile the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child."

Lorenzo argues that NRS 126.051(1)(b) applies to her case because she alleged in her complaint that she lived with Gendebien from 2016 to 2021, and A.G. was born in June 2018. She also suggests that NRS 126.051(1)(d) applies because her complaint alleged that A.G. was received into their home and she and Gendebien both continuously held A.G. out as their child. Although her complaint did not cite NRS 126.051, Lorenzo was not required to do so to withstand a motion to dismiss pursuant to NRCP 12(b)(5). *See Droge*, 136 Nev. at 308, 468 P.3d at 878 (holding that a complaint need not identify a precise legal theory in order to state a claim for relief). As we consider all factual assertions contained in her complaint as true for the limited purpose of surviving NRCP 12(b)(5) dismissal, we therefore conclude that Lorenzo sufficiently pleaded that the applicable paternity presumptions in NRS 126.051(1) apply to her case subject to the "practicab[ility]" of applying the paternity statutes to her maternity action. NRS 126.231.

To reiterate, NRS 126.231 provides that "the provisions of [NRS Chapter 126] applicable to the father and child relationship apply to" an action to determine maternity "[i]nsofar as practicable." The district court found that these factors were inapplicable to Lorenzo, due to her lack of a biological link to A.G. or marital or domestic partner relationship to

15

Gendebien, and that she was not a party to the gestational agreement. Therefore, the court determined that the applicability of parentage presumptions Lorenzo sought to invoke under NRS 126.051 need not be ruled on.[6]  Lorenzo argues that application of the presumptions in NRS 126.051(1)(b) and (1)(d) is practicable because  they are based in social and familial conduct rather than genetic factors, so they can be performed by either parent, regardless of sex or gender.  But Gendebien counters that applying these presumptions to this specific case would open the door to results not contemplated by the legislature, namely women not genetically linked to a child being adjudicated the mother under NRS 126.051(1).

Nevada appellate courts have not expressly addressed the question of whether the paternity presumptions found in NRS 126.051(1) can apply equally to women under NRS 126.231 when they are not biologically related to the child, have not equitably adopted the child, and have not been identified as the mother in the gestational agreement.  But in resolving a maternity dispute between two female former same-sex partners under the NPA , our supreme court held that the paternity statutes apply to maternity actions "insofar as practicable" under  NRS 126.231 and

---

[6]During the October 2022 hearing, although the district court expressed that it w as sympathetic to Lorenzo's position, it ruled that "under the current state of the law," Nevada's parentage statutes did not "accord her status as a parent of a child ."  As to the presumptions, the court also noted that "this is a case where the legislature or the court—the Supreme Court needs to be making these determinations rather than the trial court making new law."  In its January 2023 written order, it found that   Lorenzo "acknowledged she is not the biological mother of the child, did not carry the child, or donate the egg, and accordingly any presumptions under NRS 126.051 have been overcome and negated, and the Court does not need to rule on the applicability of the paternity presumption statutes to presumptions of maternity."

then cited some of the ways paternity can be established under NRS 126.051, including the provision regarding holding oneself out as a parent. *St. Mary*, 129 Nev. at 653, 309 P.3d at 1032. While the supreme court did not address whether these presumptions would be applicable under the circumstances at bar, it did favorably cite cases from California that analyzed that state's nearly identical paternity presumption statute and applied those presumptions to putative mothers. *Id*. at 656, 309 P.3d at 1033-34. Specifically, the supreme court cited *Elisa B. v. Superior Court*, where a district attorney filed an action to compel a same-sex former partner of a woman who had biological twins to pay child support under California's Uniform Parentage Act. 117 P.3d 660, 662-63 (Cal. 2005).

In *Elisa B.*, the California Supreme Court analyzed California Family Code section 7611(d), which stated that "[a] man is presumed to be the natural parent of a child if . . . [h]e receives the child into his home and openly holds out the child as his natural child."[7] *Id*. at 667. The court noted that California Family Code section 7650 provided that, in determining a mother and child relationship, "*[i]nsofar as practicable*, the provisions of this part applicable to the father and child relationship apply [to the mother]." *Id*. at 665 (emphasis added). The court agreed with the California Court of Appeal that the statute and legal principles concerning the presumed father apply equally to a woman seeking a maternity determination. *Id*. at 667. It further held that the former partner was the twins' parent and was thus obligated to pay child support because she

---

[7]This statute was amended in 2013 to include gender-neutral language. It now provides that "[a] person is presumed to be the natural parent of a child if . . . [t]he presumed parent receives the child into their home and openly holds out the child as their natural child. " Cal. Fam. Code § 7611(d) (2013).

received the twins into her home and held herself out as their mother. *Id*. at 670. The court was not dissuaded by the fact that there was no adoption agreement between the biological mother, who was impregnated by artificial insemination, and the former partner. *Id*. at 663. Nor did it place weight on the fact that the former couple never registered as domestic partners. *Id*. The court instead emphasized that the children were conceived with the expectation that both partners would raise the children and that the former partner voluntarily accepted the rights and obligations of parenthood once the children were born. *Id*. at 670. Similarly, here, Lorenzo alleges that there was an expectation that both Lorenzo and Gendebien would raise A.G. as their child in the household they shared.

*Elisa B.* also relied on *In re Karen C.*, where the California Court of Appeal held that applying the presumption regarding holding oneself out as a parent in California Family Code section 7611(d) was "practicable" in a maternity action. 124 Cal. Rptr. 2d 677, 682 (Ct. App. 2002). There, a 12-year-old child had requested that the juvenile court decree the existence of a mother-daughter relationship between her and a nonbiologically related woman who, the child alleged in her complaint, had raised her for the first ten years of her life. *Id*. at 677-78. Assuming the truth of the factual allegations in the child's complaint, the court of appeal concluded that the putative mother would be rebuttably presumed to be the child's natural parent. *Id*. at 682.

In *St. Mary*, our supreme court concluded that California's precedent addressing its parentage statutes, including *Elisa B.*, was "highly persuasive" for two critical reasons. First, because it analyzed a statutory scheme with many similarities to Nevada's. *St. Mary*, 129 Nev. at 656, 309 P.3d at 1034. Second, the California Supreme Court recognized the

important policy consideration that having two parents is typically in a child's best interest. *Id.* Indeed, the pertinent language in California Family Code section 7611(d) is almost identical to NRS 126.051(1)(d), and both statutes are substantively identical to the UPA as promulgated in 1973. *See St. Mary*, 129 Nev. at 652, 309 P.3d at 1031 (noting that the NPA is modeled after the UPA); Cal. Fam. Code § 7600 ("This part may be cited as the Uniform Parentage Act.").[8] Moreover, California Family Code section 7650 and NRS 126.231 are substantively identical and share a nexus to the UPA, further suggesting a gender-neutral approach should apply to Nevada's parentage statutes. *Compare* Cal. Fam. Code § 7650 ("*Any interested person* may bring an action to determine the existence or nonexistence of a mother and child relationship. *Insofar as practicable*, the provisions of this division applicable to the father and child relationship apply." (emphases added)), *with* NRS 126.231 ("*Any interested party* may bring an action to determine the existence of a mother and child relationship. *Insofar as practicable*, the provisions of this chapter applicable to the father and child relationship apply to that action." (emphases added)).

Given the similarity of Nevada's statute to California's and the important policy considerations implicated therein for gender neutrality, we conclude that applying the paternity presumptions in NRS 126.051(1)(b) and (1)(d) is practicable here. *See Karen C.*, 124 Cal. Rptr. 2d at 682 ("It is

---

[8]*See, e.g.*, 2017 UPA § 609 Comment (explaining that the recognition of presumptive parentage for unmarried, nonbiological parents was "modeled" on trending state norms derived from equity, statutes, and caselaw); *see also* Douglas NeJaime, *The Nature of Parenthood*, 126 Yale L.J. 2260, 2370-72 (2017) (compiling references to "jurisdictions in which unmarried, nonbiological parents may attain some form of parental recognition without having adopted the child").

[not] impracticable to apply the presumption equally to women; rather, it merely means that the presumption, when applied, is usually easier to rebut by clear and convincing evidence in the case of a woman." (internal quotation marks omitted)).  It follows that maternity, like paternity, can be rebuttably presumed when a putative mother receives a child into her home and holds herself out as the child's parent or when she resides with the child's natural father for six months prior to conception and  through the period of pregnancy.[9]  *See* NRS 126.051(1)(b), (d); *see also Elisa B.* , 117 P.3d at 668-69.

In  light  of  our  clarification  that  Nevada's  presumptive parentage statutes may be equally asserted in maternity actions to survive

---

[9]In addition to California, several states have similarly concluded that nonbiological parents may pursue presumptive  parentage status based on the conduct of an interested party in living with a child and treating the child as their own.  *See, e.g.*, *In re Parental Resps. of A.R.L.* , 318 P.3d 581, 584-85 (Colo. App. 2013)  (noting that presumptive parentage status "may be demonstrated by, among other things  . . . receiving the child into one's home and holding the child out as a natural child" and "[d]epending upon the evidence presented, a person may be a presumed parent without being a biological or adoptive parent "); *In re Parental Resps. of A.D.* , 240 P.3d 488, 491 (Colo. App. 2010) (affirming a finding of presumptive parentage of a nonbiological father and rejecting an argument that, under the UPA, a biological or adoptive relationship is required to establish a parent-child relationship); *Partanen v. Gallagher* , 59 N.E.3d 1133, 1138-40 (Mass. 2016) (concluding a presumptive parentage statute may be invoked  "even where biological ties to the children are absent " because it was "consistent with our construction of other provisions in the statute"); *In re Guardianship of Madelyn B.*, 98 A.3d 494, 501 (N.H. 2014) (holding a former same-sex partner, not biologically related to a child, may pursue a  parentage claim because she "adequately pleaded that she received [the child] into her home and openly held [the child] out as her child" ); *Chatterjee v. King* , 280 P.3d 283, 296 (N.M. 2012) (holding a same-sex partner of  a child's adoptive mother asserted sufficient facts to give her standing to establish parentage "because her allegations satisfy the [statutory] hold out provision").

dismissal, we must also conclude under the NRCP 12(b)(5) dismissal standard that Lorenzo's allegations are sufficient to state a claim with regard to both subparts of NRS 126.051, (1)(b) and (1)(d) of Nevada's presumptive parentage statute. She alleged in her complaint that (1) "the parties were never married but lived together in a familial relationship from 2016–November 2021," (2) A.G. "was conceived and born while the parties lived together in a family relationship," (3) "both parties have continuously held [Lorenzo] out as the child's mother," (4) the parties had an agreement that Lorenzo would be added to the child's birth certificate, (5) after separation, the parties shared joint physical custody (equal time share) for several months until Gendebien began to dictate and control Lorenzo's parental time, and (6) Lorenzo was not aware of anyone, other than the parties, who claimed parentage, custody, or visitation rights as to the child.

Because the truth of Lorenzo's factual allegations must be presumed on an NRCP 12(b)(5) motion to dismiss, we conclude that she has alleged sufficient facts in satisfaction of NRS 126.051(1)(b) and (1)(d) such that she may assert her status as a presumptive parent, and her action to determine the existence of a mother and child relationship under NRS 126.231 must withstand dismissal. *See Buzz Stew*, 124 Nev. at 228, 181 P.3d at 672. As a result, the district court's NRCP 12(b)(5) dismissal of Lorenzo's parentage action must be reversed.

*Application of NRS 126.051's rebuttable parentage presumption*

Once a putative parent, like Lorenzo, survives dismissal, the putative parent must establish her claims of entitlement to recognition as a presumptive parent under any applicable subpart of NRS 126.051(1)(a)-(d). *See, e.g.*, *In re Est. of Murray*, 131 Nev. at 71, 344 P.3d at 424 (concluding that the respondent was entitled to a presumption of paternity under NRS 126.051(1)(d) after she demonstrated that she was received into the home

21

during her minority and held out as a natural child of the father).  Our statutes, however, do not expressly designate the applicable burden a putative parent carries in demonstration of this presumptive status.  But as we have held, a preponderance of the evidence  remains the "default evidentiary standard in family law absent clear legislative intent to the contrary." *Monahan v. Hogan*, 138 Nev. 58, 69, 507 P.3d 588, 597 (Ct. App. 2020) (internal quotation marks omitted).   Therefore, an evidentiary hearing must be held—providing each party with an opportunity to submit testimony and other evidence and arguments as to   Lorenzo's satisfaction of NRS 126.051(1) and the applicable subparts she advances in support of her invocation of presumptive parentage status by a preponderance of the evidence.

The district court must ultimately make specific findings under NRS 126.051(1) and each relevant subpart therein.    *Cf. Davis v. Ewalefo*, 131 Nev. 445, 452, 352 P.3d 1139, 1143 (2015) (holding that specific findings and adequate explanation of the reasons  behind the district court's determination in a child custody matter are necessary for benefit of appellate review).  If the court finds that Lorenzo has failed to demonstrate by a preponderance of the evidence her presumptive status under any of the subparts advanced, her parentage claim fails.   But alternatively, if the district court finds that Lorenzo has met her burden under NRS 126.051(1) to establish presumptive status by a preponderance of the evidence as to any subpart, the court must proceed to the rebuttal inquiry.

The statute controlling the rebuttal inquiry, NRS 126.051(3), enumerates that "[a] presumption under subsection 1 may be rebutted in an *appropriate action* only by clear and convincing evidence."   (Emphasis added.)   Gendebien must therefore  be provided with the opportunity to

rebut Lorenzo's presumptive parentage status.  We recognize, however, that until now the district court did not have the benefit of an established test to determine how a parentage case concerning the invocation of the presumptive parentage statutes may be rebutted in  "an appropriate action."

In enumeration of NRS 126.051(3), the Nevada Legislature did not expressly define what constitutes an "appropriate action" for rebutting a parentage presumption.  Nor have courts across the United States been uniform in how they construe this phrase in UPA-modeled presumptive parentage provisions.  Some courts, such as the Minnesota Supreme Court, treat "appropriate action" as a threshold, procedural limitation: an action is "appropriate" only if it is timely and brought by a party with standing under the parentage statutes, and if those predicate requirements are not met, the trial court never reaches the merits of the rebuttal inquiry.   *In re Est. of Jotham*, 722 N.W.2d 447, 454-55 (Minn. 2006).

*In re Estate of Jotham*  involved an intestacy dispute in which one presumed child sought, more than 50 years after her sister's birth, to rebut the statutory presumption that the sister was also the decedent's child.  722 N.W.2d at 449.  The Minnesota Parentage Act (MPA)   permitted a paternity presumption to be rebutted by clear and convincing evidence only in "an appropriate action," but did not define that phrase.  *Id*. at 454.  The court rejected the argument that "an appropriate action" meant any properly filed legal proceeding.  *Id*.  Instead, it reasoned that such a broad construction would render the limiting phrase meaningless and would allow parties to evade the  scheme's standing and timeliness requirements.  *Id*. at

454-55.[10]  And it was on this basis that the court determined that rebuttal cannot be attempted in a paternity action under the MPA where a party lacks standing or the action is untimely.  The *Jotham* court therefore construed "an appropriate action" as one in which the party seeking rebuttal would be permitted, under the MPA, to bring an action declaring the nonexistence of the presumed parent-child relationship.  *Id*. at 455-56.

Subsequently, in *Murray*, the Nevada Supreme Court adopted *Jotham*'s reasoning as instructive in the probate context, concluding that this approach furthered the NPA's underlying principles of early establishment of parent-child relationships and stability for legally recognized families.  *See In re Est. of Murray*, 131 Nev. at 69-71, 344 P.3d at 422-24 (adopting *Jotham*'s reading in the probate context and using "appropriate action" to incorporate NRS Chapter 126's rules concerning limitations and standing).  In doing so, the supreme court also recognized that legal parentage may turn on more than biology alone.  *Id*. at 68-69, 344 P.3d at 422 (recognizing that parentage may rest on "a wide array of considerations rather than genetics alone").

The *Murray* court began from the premise that the NPA's language, modeled after the UPA, supplies the rules for determining legal parentage in Nevada for custody and child support proceedings.  *Id*. at 68, 344 P.3d at 421-22.  The court recognized that, despite the central purpose of the NPA's adoption to address child-support obligations, a legal

_____

[10]The *Jotham* court went on to note that "[o]ther courts analyzing the meaning of 'an appropriate action' in the context of the Uniform Parentage Act have similarly concluded that the phrase signifies an action instituted pursuant to the Act . . . . While we are not bound by these courts' interpretations, we endeavor to construe uniform laws to effectuate their purpose of making the laws of the states in which they are enacted consistent with each other."  722 N.W.2d. at 455.

determination of parentage carries consequences beyond custody or support, including inheritance rights. *Id*. at 68, 344 P.3d at 422. And because the legislature had not created a separate framework for determining parentage in probate proceedings, the court concluded that parentage disputes in that context must be resolved under the NPA. *Id*. at 69, 344 P.3d at 422-23. The *Murray* court therefore decided that contrary evidence was insufficient to rebut a parentage presumption except in certain actions. *Id*. Relying on *Jotham*, it recognized that a parentage presumption may be rebutted only in an action properly brought and maintained under controlling parentage statutes. *See id*. at 70-72, 344 P.3d at 423-24 (explaining that "an appropriate action" restricts the circumstances in which a paternity presumption may be rebutted and holding that the appellants lacked standing and were time-barred from challenging paternity status). Thus, although *Murray* arose in a probate proceeding, its reasoning is instructive here because it confirms that rebuttal under NRS 126.051 depends not merely on the existence of contrary evidence, but on whether the party seeking rebuttal may properly maintain a parentage action under the NPA.

Here, once Lorenzo's action is determined to be authorized under the NPA, which we have done, it qualifies as an "appropriate action" for purposes of rebuttal under NRS 126.051(3). This understanding accords with *Murray*'s recognition that parentage presumptions serve important policies beyond genetics, including finality, family stability, and the protection of established parent-child relationships.

And while *Murray* is instructive on the timing and distinct nature of the appropriate action analysis in the presumptive parentage context, Nevada caselaw does not establish the specific considerations a

district court should evaluate for purposes of the rebuttal inquiry. We therefore may look to California authority interpreting substantially similar parentage statutes. *See St. Mary* , 129 Nev. at 656, 309 P.3d at 1034 ("California's precedent is highly persuasive because it pertains to a statutory scheme that is substantially similar to Nevada 's and advances the policies that underlie the Nevada Parentage Act . . . ."); *see, e.g.*, *Shapiro v. Welt*, 133 Nev. 35, 39, 389 P.3d 262, 268 (2017) (observing that because "California's and Nevada's anti-SLAPP statutes are similar in purpose and language, we look to California law for guidance" (internal quotation marks and citations omitted)).

With nearly identical language to Nevada's statutes, California's corollary statutes on the nature and requirements of rebuttal have been evaluated under similar facts and circumstances as those implicated in the present case. *Compare* NRS 126.051(3) ("A presumption under subsection 1 may be rebutted in an *appropriate action* only by clear and convincing evidence." (emphasis added)), *with* Cal. Fam. Code § 7612(a) ("[A] presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an *appropriate action* only by clear and convincing evidence. " (emphasis added)).

In addressing its equivalent parentage statutes, the California Supreme Court has effectively conjoined the "appropriate action" inquiry with the substantive rebuttal analysis itself, asking whether, on the particular facts and policy considerations presented, it is *appropriate to displace* the presumption at all. *See, e.g.*, *Nicholas H.* , 46 P.3d 932, 941 (Cal. 2002) (holding the section 7611(d) presumption "may be rebutted in an appropriate action" but concluding rebuttal was not "appropriate" where doing so would leave the child fatherless); *see also In re Jesusa V.* , 85 P.3d

26

2, 11 (Cal. 2004) (weighing competing presumptions by reference to "policy and logic" under its equivalent statute in light of the child's established family unit); *In re Karen C.*, 124 Cal. Rptr. 2d at 682 (extending the section 7611(d) presumption to a nonbiological mother and remanding for a determination of whether rebuttal was "appropriate" under *Nicholas H.*); *In re Salvador M.*, 4 Cal. Rptr. 3d 705, 709 (Ct. App. 2003) (declining to find rebuttal "appropriate" where that would sever a deeply rooted mother-child bond and there were no competing maternal claims).

In *Elisa B.*, the California Supreme Court synthesized this line of authority and articulated, in substance, a merits-focused "appropriate rebuttal" inquiry—holding that, where circumstances exist factually that favor the nonbiological parent, rebuttal was not "appropriate" despite clear evidence of no genetic relation. 117 P.3d at 667-70. The court identified three reasons why the presumption could not be appropriately rebutted in that case. First, the petitioner seeking presumptive parentage status "actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother." *Id*. at 670. Second, the petitioner voluntarily expressed an intention to accept the responsibilities and enjoy the benefits of parenthood together with her partner from before the children were conceived through the first years of the children's lives. *Id*. Third, akin to *Nicholas H.*, there was no competition from any other person claiming to be the children's second parent, and allowing rebuttal of the presumption in that case would have left the children without the support of a second parent—a responsibility that would ultimately fall to the state to assume. *Id*. (clarifying that rebuttal of presumptive parentage is generally inappropriate where "there are no competing claims to [a petitioner] being

27

the children's second parent"); *see also In re Salvador M.* , 4 Cal. Rptr. 3d at 709 ("[W]e conclude this is clearly *not* an appropriate action to find respondent rebutted the presumption because there was no competing maternal interest and to sever this deeply rooted mother/child bond would contravene the state's interest in maintaining the family relationship.").

We now hold the California approach, as augmented by several jurisdictions,[11] to be persuasive in the adoption of a new framework to determine the outcome of a putative parent's claim to presumptive parentage status—concluding that Nevada courts must apply its statutory scheme as likewise considered and employed by the California Supreme Court in *Elisa B* for purposes of rebuttal. We crystalize those reasons as conjunctive factors instructive to the rebuttal inquiry, including (1) family-formation, intent, and conduct; (2) voluntary assumption of parental responsibilities; and (3) existence and nature of competing parentage claims

---

[11]Several jurisdictions have expressly designated the California approach articulated in *Elisa B.* as instructive to the rebuttal inquiry. Most notably, the New Mexico Supreme Court, applying materially identical UPA language, has followed a similar integrated approach, treating "appropriate action" as part of the substantive rebuttal inquiry rather than a separate procedural bar. *Chatterjee v. King* , 280 P.3d 283, 294-95 (N.M. 2012) (looking to *Nicholas H.* , *Elisa B.* , and related UPA cases and grounding the rebuttal analysis in family- formation intent, the child's established attachments, and the absence of a superior competing claim) ; *see also In re A.D.* , 240 P.3d 488, 490 (Colo. App. 2010) (declining to consider rebuttal arguments where a child had bonded with a presumptive father and severance risked trauma); *Partanen v. Gallagher* , 59 N.E.3d 1133, 1140 (Mass. 2016) ( emphasizing that rebuttal may be achieved by disproving the putative parent's assertions about her involvement in pre-birth planning).

brought by putative parents with no genetic connection to the child. [12]

The district court must consider and make specific findings under each of the three factors and weigh them to determine if a putative parent's assertion of presumptive parentage status is rebutted despite evidence that a putative parent seeking maternity was not, in fact, the biological parent of the subject minor. *See* NRS 126.051(3) (articulating the rebuttal burden in the presumptive parentage context as clear and convincing evidence); *cf. Pryor v. Pryor*, 103 Nev. 148, 150, 734 P.2d 718, 719 (1987) (explaining that Nevada begins with the presumption that property acquired during marriage is community property and that the party asserting a separate property claim bears the burden to rebut that presumption by clear and convincing evidence); *Lopez v. Lopez*, 139 Nev. 533, 540-41, 541 P.3d 117, 124-25 (Ct. App. 2023) (emphasizing that the presumption of community property can be overcome only by clear and convincing evidence).

As to the family-formation factor, the inquiry turns on whether the putative parent actively participated in the decision to conceive or form the family with the shared understanding that the person would raise the child as a parent. Next, under the voluntary-assumption factor, courts must determine whether the putative parent voluntarily expressed an intent to accept—and in fact accepted—the responsibilities and benefits of parenthood from before the child's conception or at birth through the early

---

[12]We note, as to the competing parentage factor, our supreme court has already determined that genetic parentage under NRS 126.051(2) is superior to putative parentage without genetic connection. *See Rosie M.*, 138 Nev. at 542-43, 512 P.3d at 762-63.

part of the child's life.[13]   Finally, under the competing-parentage factor , courts determine whether there is competition from another person claiming to be the child's second parent or whether rebuttal would instead leave the child without the support of a second parent .[14]

In sum, once a party has properly invoked Nevada's parentage statutes—*i.e.,* the action is "appropriate" in the *Jotham-Murray* sense because it satisfies NRS Chapter 126's standing and limitations requirements—the "appropriate action" language in NRS 126.051(3) does not create a second, free-standing procedural hurdle.   Instead, it is answered within the substantive rebuttal analysis itself: the district court must determine, under the clear-and-convincing-evidence standard, whether the presumption of parentage is *appropriately rebutted on these facts* in light of the family-formation, voluntary-assumption, and competing-claims considerations.

---

[13]We note that the existence of a gestational surrogacy contract and terms therein may be considered as one of many facts and circumstances of the case that may inform either the family-formation or voluntary-assumption factors.   The mere existence of a contract is not, however, determinative of any factor.

[14]Nevada law now explicitly permits a child to have a legal parent-child relationship with more than two persons, though the practical application of three or more parent custodial arrangements remains subject to judicial determination and the best-interest-of-the-child standard.   *See* NRS 126.021(3) (stating the definition of "parent and child rel ationship" "does not preclude a determination by a court that a child has such a legal relationship with more than two persons "); *see also St. Mary*, 129 Nev. at 654-57, 309 P.3d at 1032-35  (holding the NPA does not preclude a child from having two legal mothers).   Although that issue does not appear to be present in this case, we nevertheless acknowledge that additional clarity as to what constitutes a "competing claim" may be necessary in future litigation involving gestational surrogacy and parentage .

Here, the district court is therefore instructed on remand to make its findings under our newly announced three-factor test in evaluation of Gendebien's rebuttal arguments, assuming the case reaches that stage. Just as it must make specific findings under NRS 126.051(1), the district court holds the same obligation to make specific findings under NRS 126.051(3). *Cf. Davis*, 131 Nev. at 452, 352 P.3d at 1143. But the court need not bifurcate its evidentiary proceedings or decisions where the same evidence bears on both the existence of a parentage presumption and the rebuttal inquiry. *Cf. Monahan*, 138 Nev. at 65-69, 507 P.3d at 594-96 (concluding that not every best-interest factor had to be applied anew where the relevant findings had already been considered and that any failure to make a new analysis of overlapping best-interest factors was harmless).

If Lorenzo satisfies the presumptive burdens, then Gendebien must meet his burden for the rebuttal factors. If he does not, then the case is *not* an appropriate action for rebuttal. But if the district court weighs the factors and determines Gendebien has satisfied his burden, then Lorenzo's presumptive parentage status is overcome and her claims fail. As we clarify above and discuss further next, Lorenzo's parentage claim is not based on a genetic relationship, so Gendebien's assertion that she lacks a biological link is not controlling to prospective rebuttal arguments—especially if there is no competing claim or conclusive presumption like in *Rosie M*. *See* 138 Nev. at 543-44, 512 P.3d at 762-63.

Thus, in sum, if Lorenzo meets her burden in showing her presumptive parentage status, the burden shifts to Gendebien to demonstrate such status is appropriately rebutted with clear and convincing evidence. If her burden is met and his burden is not met, Lorenzo would be granted parental rights, and the case would then turn to

what custody arrangement and parenting time Lorenzo should be granted that is in the best interest of the child. *See* NRS 125C.0035(1) ("In any action for determining physical custody of a minor child, the sole consideration of the court is the best interest of the child."); *Davis*, 131 Nev. at 451, 352 P.3d at 1143 (same). But if he does meet his burden, then judgment would be entered in favor of Gendebien.

*Impact of the gestational agreement*

Gendebien argues that even if the presumptions of maternity under NRS 126.051(1)(b) and (1)(d) apply here, the existence of a valid gestational agreement controls the issues of maternity and custody. Lorenzo responds that while the gestational agreement may establish Gendebien's parentage at the time of A.G.'s birth, it does not forever preclude her from establishing parentage when in A.G.'s best interest.

The construction and interpretation of a statute presents a question of law that is reviewed de novo. *Irving v. Irving*, 122 Nev. 494, 496, 134 P.3d 718, 720 (2006). Appellate courts follow the plain meaning of a statute absent an ambiguity. *Id.* A statute is ambiguous if it is susceptible to two or more reasonable interpretations. *Id.* When a statute is ambiguous, appellate courts look to legislative intent to ascertain its meaning. *Id.*

Where a legal question invokes multiple statutes, courts are to construe the statutes as a whole so as to reconcile and harmonize them to the extent practicable. *Diamond Nat. Res. Prot. & Conservation Ass'n v. Diamond Valley Ranch, LLC*, 138 Nev. 436, 441, 511 P.3d 1003, 1007 (2022). When two statutory provisions conflict, appellate courts apply rules of statutory construction to resolve the conflict. *Williams v. State, Dep't of Corr.*, 133 Nev. 594, 600, 402 P.3d 1260, 1265 (2017). Appellate courts should avoid interpretations that render statutory language meaningless or

superfluous. *Id.* at 596, 402 P.3d at 1262. Ambiguous statutes should also be read in a fashion that conforms to reason and public policy. *Nuleaf CLV Dispensary, LLC v. State, Dep't of Health & Hum. Servs.*, 134 Nev. 129, 133, 414 P.3d 305, 309 (2018).

NRS 126.500 to NRS 126.810, inclusive, govern gestational agreements. Pursuant to NRS 126.710(2), "[i]f two persons are the intended parents, both of the intended parents must be parties to the gestational agreement." "The intended parent or parents shall be considered the parent or parents of the resulting child immediately upon the birth of the child." NRS 126.720(1)(a). "The resulting child shall be considered the child of the intended parent or parents immediately upon the birth of the child." NRS 126.720(1)(b). "Parental rights vest in the intended parent or parents immediately upon the birth of the resulting child." NRS 126.720(1)(c). "Sole legal and physical custody of the resulting child vest with the intended parent or parents immediately upon the birth of the child." NRS 126.720(1)(d).

The language of NRS 126.710(2), standing alone, is clear and unambiguous. NRS 126.710(2) plainly states that if there are two parents of a child born pursuant to a gestational carrier, then both intended parents must be named as such on the gestational agreement. Because Lorenzo is not listed as an intended parent on the gestational agreement, it follows that she is not an intended parent of A.G. pursuant to the gestational agreement.

NRS 126.720(1) can, and should, be interpreted according to its plain language as well. Subsections (a), (b), and (d) of that statute all include the phrase "immediately upon the birth of the child" and subsection (c) includes the phrase "immediately upon the birth of the resulting child."

Per the statute, this is when parental and custody rights vest in the intended parents. The phrase "immediately upon the birth of the child" (or the "resulting child") is clear and unambiguous. This phrase is *inclusive* of the intended parents and guarantees that their parental status and parental rights vest as the intended parents immediately upon the birth of the child. But this phrase does not, as Gendebien suggests, operate as a bar to establishing post-birth parentage status by persons who are not excluded by the gestational agreement. Indeed, nothing in NRS 126.710 rules out the possibility that another person may thereafter enter the child's life and become a parent if such rights accrue before or shortly after birth as alleged in this case.

As previously discussed, NRS Chapter 126 provides alternative pathways to parental recognition. These pathways allow an interested party to establish post-birth presumptive parentage status, including by showing that the putative parent cohabitated with the biological parent for at least six months before the period of conception or received the child into their home and held themselves out as the child's parent immediately after birth. *See* NRS 126.051(1)(b), (d). Permitting a party to invoke those provisions to assert presumptive parentage is consistent with Nevada's parentage scheme as a whole, which recognizes that "the relationship between a parent and child is of fundamental societal and constitutional dimension." *St. Mary*, 129 Nev. at 654-55, 309 P.3d at 1032-33. The policies underlying that scheme likewise include identifying parental support obligations, preventing children from becoming wards of the state, and advancing the child's best interest. *Id*. at 656, 309 P.3d at 1034; *see also Willerton v. Bassham*, *State, Dep't of Hum. Res.*, 111 Nev. 10, 20, 889 P.2d 823, 829 (1995) (holding that the "overarching purpose" of the UPA "and

34

most state acts modelled thereon" is to identify parental support obligations and to prevent the child from becoming a ward of the state ).

Foreclosing an interested party from seeking presumptive parentage status merely because they were not identified as an intended parent when the gestational agreement was signed cannot, therefore, be squared with NRS Chapter 126's broader statutory purpose and would risk absurd results, which courts must avoid. *See City of Henderson v. Wolfgram*, 137 Nev. 755, 757, 501 P.3d 422, 424 (2021) ("[Appellate courts] will avoid constructions that would lead to an absurd result."). For example, reading NRS 126.720(1) as having an *exclusive* effect—as Gendebien suggests—as opposed to an *inclusive* effect, might forever foreclose interested parties from bringing actions to determine parentage. That approach risks, in some circumstances, adversely impacting children because they were born subject to a gestational agreement and could never benefit from the recognition of more than one parent under our presumptive parentage statutes.[15] Therefore, Gendebien's argument that Lorenzo's

---

[15]We stress, however, that these principles do not require a district court to recognize a putative parentage claim merely because doing so could reduce the possibility of wardship or provide an additional source of financial support. The child's best interest remains the "polestar of judicial decision making in family law matters." *Monahan*, 138 Nev. at 62, 507 P.3d at 592. Although Nevada law generally presumes that a child's best interest is served by the support of two or more parents, *see St. Mary*, 129 Nev. at 656, 309 P.3d at 1034 , that understanding does not independently compel recognition of another legal parent where doing so would not serve the child's best interest. *Cf*. NRS 125C.001(1) (stating Nevada's policy that children maintain a relationship with both parents after the parents have ended their relationship with each other); *see also In re Guardianship of N.M.*, 131 Nev. 751, 757, 358 P.3d 216, 219-20 (2015) ( "[W]hen determining whether a parent is qualified and suitable, the district court must give 'the child's basic needs [and] welfare' priority over the parent's interest in custody.").

omission as a named, intended parent to the gestational agreement categorically bars her from invoking Nevada's presumptive parentage statutes is unpersuasive on the record we have and inconsistent with the scheme's broader purpose.[16]

The legislative history of NRS 126.720 reinforces our interpretation here. NRS 126.720 was enacted in 2013 as part of what was originally Assembly Bill 421, 2013 Nev. Stat., ch. 213, §§ 26-27, at 810, which sought to modernize Nevada's laws concerning assisted reproduction and gestational agreements.[17] While parts of NRS 126.720 were amended in 2015 and 2017, subsection (1) has remained unchanged. Much of the committee discussion of the original bill addressed lawmakers' concerns about a surrogate attempting to establish parentage over the child:

> Assemblyman Wheeler: Will this law protect
> parents from a donor or a surrogate coming back

---

[16]Moreover, Lorenzo alleged in her reply brief on the motion for reconsideration that she was unaware of the existence of a written gestational agreement until it was disclosed by Gendebien after she filed her complaint. Lorenzo further submits that "the type of Gestational Agreement which [Gendebien] refers to does nothing more than establish that the paid surrogate, or their spouse, do not have parental rights over the birthed child." Indeed, we note that the ultimate Order Establishing Parentage that was issued on the basis of the joint petition filed by Gendebien, the surrogate, and the surrogate's spouse in February 2018 ordered that the surrogate "is not genetically related to the child, and has neither parental rights nor parental obligations to raise the child" but did not address Lorenzo's status.

[17]See, e.g., Hearing on A.B. 421 Before the Assemb. Comm. on Judiciary, 77th Leg. (Nev., Apr. 8, 2013) (testimony of Kimberly Surratt, Esq.) ("The year 1995 does not sound like a significant amount of time for most people when you are talking about law, but when you talk about the advancements in medical technology for the reproductive industry, it is a significant amount of time.").

> when a child is two or three years old and saying that that is their kid?
>
> Kimberly Surratt: In my opinion, absolutely yes; it will protect them. Can a surrogate or donor still show up and throw their hands up and jump up and down? Yes, but the parentage will already be an absolute nonappealable decision based on these statutes and the timeline.

Hearing on A.B. 421 Before the Assemb. Comm. on Judiciary, 77th Leg. (Nev., Apr. 8, 2013). Importantly, the comments about parentage being an "absolute nonappealable decision" were made in the context of a hypothetical surrogate trying to assert parental rights after the child was born, a key issue this bill was intended to remedy. *See id.* This intent was codified in NRS 126.720(1)(e), which provides that "[n]either the gestational carrier nor her legal spouse or domestic partner, if any, shall be considered the parent of the resulting child." Read in context and considered as a whole, *see In re Pub. Recs. Requests to LVMPD*, 141 Nev., Adv. Op. 26, 569 P.3d 624, 629 (2025), the foregoing provisions were intended to reinforce the rights of the intended parents over the gestational carrier, not permanently

prevent all other interested persons from asserting parental rights. [18] Although the question at bar involves multiple statutes, we construe the plain meaning of each to be in harmony, *see Diamond Nat. Res. Prot. & Conservation Ass'n*, 138 Nev. at 441, 511 P.3d at 1007 , and it is not the case that these statutes otherwise compel our engagement in Nevada's canon s of statutory construction, *cf. Williams*, 133 Nev. at 600, 402 P.3d at 1265.

*CONCLUSION*

We hold that the district court erred in dismissing Lorenzo's complaint on the grounds that she had no genetic link to the minor child, was not married to the child's biological father, and was not included as an intended parent in the gestational agreement. We now clarify that when a gestational agreement names only one intended parent, another interested party who has not been excluded from seeking parentage under the terms

---

[18]This point is particularly salient here, as we previously noted that there is a factual contention by Lorenzo—who was omitted as an intended parent from the gestational agreement—that she was not even aware of the existence of the written contract between Gendebien and the surrogate. Specifically, her reply brief on reconsideration asserts that the "Gestational Agreement referred to by [Gendebien], is not an agreement that [Lorenzo] was a party to or that was she aware of and is irrelevant " to her claims for parentage and custody. As she characterizes, this "secret Gestational Agreement was not made known to [Lorenzo] until it was disclosed in the discovery phase after she filed her Complaint. " Lorenzo also suggested in her reply brief on reconsideration that if, "as [Gendebien] seems to imply, [Lorenzo] was a Necessary Party to the Gestational Agreement, his failure to join her likely renders any such judgment invalid." *See generally Gladys Baker Olsen Fam. Tr. ex rel. Olsen v. Eighth Jud. Dist. Ct.* , 110 Nev. 548, 553-54, 874 P.2d 778, 781-82 (1994) (holding that to render a complete decree in any civil action, "all persons materially interested in the subject matter of the suit [must] be made parties so that there is a complete decree to bind them all" and that the failure to join a necessary party to a case was "fatal to the district court's judgment"); *see also* NRS 126.101(1)-(2) (describing necessary parties in a paternity action).

of the gestational agreement by consent has standing to bring a maternity or custody action and may survive NRCP 12(b)(5) dismissal of those claims if the complaint alleges facts that establish presumptive parentage status under NRS 126.051(1).

Further, once a putative parent's complaint survives dismissal under the NRCP 12(b)(5) standard, the district court must determine, after an evidentiary hearing, if the putative parent has demonstrated their presumptive parentage status pursuant to NRS 126.051(1) by a preponderance of the evidence. If the putative parent does not adequately demonstrate their presumptive parentage status, they may not maintain their parentage claim. But if the court determines that the putative parent has demonstrated their presumptive parentage status, upon specific findings under NRS 126.051(1), the court will then shift to the rebuttal inquiry under NRS 126.051(3). If the presumption is not appropriately rebutted by clear and convincing evidence, then the district court shall declare that parentage exists and move forward to determine the

appropriate custody arrangement in the best interest of the child. [19] If the presumption is rebutted, then judgment is to be entered for the biological parent or intended parent named in the gestational agreement.

Accordingly, we reverse the district court's order dismissing Lorenzo's complaint, and we remand this matter to the district court for proceedings consistent with this opinion. [20]

Gibbons, J.

We concur:

---

[19]Because Lorenzo does not challenge the district court order denying her request for nonparent visitation, that portion of the court's order remains in place until the court can conduct a hearing and enter a new order or temporary order. Nevertheless, we note that the nonparent visitation order was premised upon the finding that Lorenzo had not overcome the presumption against nonparent visitation. *See* NRS 125C.050(4). Therefore, if Lorenzo establishes her presumptive parent status, and the court determines her parentage status is not appropriately rebutted, she may proceed with her request for joint custody as a parent, as would be allowed in any other custody action, based upon the best interest of the child. *See generally* NRS 125C.0035(1). However, if she does not establish her presumptive parentage status, or it is appropriately rebutted, the nonparent visitation order remains in effect, and any new order denying her complaint for maternity or custody in its entirety would be the final judgment. It will be within the district court's discretion whether and how to use the testimony and other evidence received at the evidentiary hearing on nonparent visitation in combining and resolving the issues discussed in this opinion.

[20]Insofar as the parties have raised other arguments that are not specifically addressed in this opinion, we have considered the same and conclude that they either do not present a basis for further relief or need not be reached given the disposition of this appeal.

Bulla, C.J.

Westbrook, J.